40 A.3d 290 (2012)
304 Conn. 383
STATE of Connecticut
v.
John JACKSON.
No. 18194.
Supreme Court of Connecticut.
Argued January 12, 2012.
Decided April 17, 2012.
*295 James B. Streeto, assistant public defender, for the appellant (defendant).
Raheem L. Mullins, assistant state's attorney, with whom, on the brief, was Michael Dearington, state's attorney, for the appellee (state).
ROGERS, C.J., and PALMER, ZARELLA, McLACHLAN, EVELEIGH, HARPER and VERTEFEUILLE, Js.
ROGERS, C.J.
The defendant, John Jackson, was convicted, after a jury trial, of murder in violation of General Statutes § 53a-54a. The defendant appealed from the judgment of conviction directly to this court[1] claiming that the trial court improperly: (1) denied his motion to suppress certain evidence seized by the police without a search warrant; (2) denied his motion to preclude certain evidence that the state had disclosed in an untimely manner in violation of General Statutes § 54-86k; (3) denied his motion to suppress certain statements that he gave to the police; and (4) denied his request to give an instruction to the jury on third party culpability. We affirm the judgment of conviction.
The jury reasonably could have found the following facts. The defendant and the victim, Desti Parnell, had a son, Devon, who was six years old in 2004. The victim and Devon lived on the first floor of an apartment building at 672 Legion Avenue in New Haven. In the spring of 2004, the victim permitted the defendant, with whom she was no longer romantically involved, to move into her apartment. The defendant agreed that he would move out of the apartment on July 20, 2004.
On Monday, July 19, 2004, the victim spent the night at the house of her boyfriend, Lawrence Jackson (Jackson),[2] while her son was out of state on vacation. On Tuesday, July 20, 2004, Jackson drove the *296 victim back to her apartment at approximately 2:30 p.m. and then went to work. At about 4:30 p.m., the victim's upstairs neighbor, Inez Alvarez, went to the victim's apartment to borrow some cleaning supplies. After Alvarez obtained the supplies, she and the victim stood in the common hallway talking and the defendant walked past them into the victim's apartment. Alvarez then returned to her own apartment.
About fifteen minutes later, Alvarez' niece, who was staying with her, told Alvarez that she heard someone screaming inside the apartment building. Alvarez went with her niece to the top of the staircase leading down to the first floor to determine the source of the screaming. After the screaming stopped, Alvarez heard the victim say, "Don't do this," followed by the defendant saying, "Get the fuck off me." Believing that the victim and the defendant were just having an argument, Alvarez returned to her apartment. Approximately five minutes later, Alvarez returned to the hallway and heard the victim say, "Oh my God, oh my God." Alvarez, who was by that time "freaked. . . out" and "panicking," gathered the cleaning supplies that she had borrowed from the victim, went down to the victim's apartment and knocked on the door. She initially heard someone moving around inside the apartment, but it then became quiet. Alvarez then returned to her apartment. She called the victim's cell phone several times that evening, but the victim did not answer. That night close to midnight, Alvarez heard the light sensor click on in the hallway downstairs, indicating that someone had entered the hallway.
At 2:10 a.m. on Wednesday, July 21, 2004, the defendant checked into the Carter Hotel in New York City, registering under the name Shawn Stokes. Later that day, at about 8:48 p.m., he jumped out of the hotel window in an attempt to kill himself. He landed on a third floor roof, three stories below his room. He survived, but broke both of his legs and one of his arms. He was transported to St. Vincent's Hospital in New York City for treatment.
Meanwhile, the victim had failed to appear at her job on the afternoon of Wednesday, July 21, 2004. When Jackson heard about the defendant's suicide attempt and learned that the victim had not gone to work, he became concerned about her welfare. In the early morning hours of July 22, he went to the victim's apartment, knocked on the door and windows, and tried unsuccessfully to open them. There was no response from anyone inside the apartment. Jackson then rang the doorbell of one of the victim's neighbors, Tamara Moore, who helped Jackson in his attempts to rouse the victim. When the victim failed to respond, Jackson called the police.
New Haven police and firemen arrived at the scene within minutes of Jackson's telephone call. One of the firemen entered the victim's apartment through an unlocked window and opened the door for the police officers, who discovered the victim's body in the bedroom of the apartment. The victim's wrists and ankles had been tied together behind her back with an electronic cable. Her shirt had been pulled below her chest, her skirt had been pulled up to her waist, and her underwear had been pulled down and completely off one leg. The victim had been stabbed multiple times in the forehead, ears, jaw, left cheek and rear left shoulder. She had defensive knife wounds to her hands and wrists, and her right arm was broken. The victim had been strangled and her skull had been shattered with a blunt instrument, leaving several pieces of the *297 skull on the bedroom floor.[3] A knife and a hammer, both covered with the victim's blood, were found on her bed. The defendant's semen was later found in vaginal swabs taken from the victim and on the rug under the victim's body.
The defendant subsequently was charged with and convicted of the victim's murder. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I
We first address the defendant's claim that pursuant to the fourth amendment of the United States constitution[4] and article first, § 7, of the constitution of Connecticut,[5] the trial court improperly denied his motion to suppress certain evidence, namely, a belt and four socks belonging to him that were seized by the police at the scene of his attempted suicide at the Carter Hotel in New York City. We conclude that the trial court properly determined that the defendant had abandoned his expectation of privacy with respect to the seized items and, accordingly, that it properly denied the defendant's motion to suppress.
The record reveals the following additional facts relevant to our resolution of this issue that either were found by the trial court or are undisputed. At approximately 8:48 p.m. on July 21, 2004, Kevin Neafsey, a police officer with the New York City police department, received an emergency dispatch advising him of a possible suicide jumper at the Carter Hotel. Upon his arrival at the hotel, hotel personnel brought him and two other police officers to the defendant's room and opened the door for them. Neafsey gathered the items of clothing that he found in the room, including a pair of pants with the belt still on them, and placed them in a brown paper bag for safekeeping. Neafsey *298 brought the bag containing the clothing to the police station, where it was placed in a locked property locker.
On the basis of their discussions with Jackson and Alvarez at the scene of the victim's murder, the New Haven police had identified the defendant as a suspect in the killing. On the afternoon of Thursday, July 22, 2004, Detectives Lawrence Mazzola and Herbert Johnson and Sergeant Moller[6] of the New Haven police department traveled to New York City to investigate whether the person who had attempted suicide at the Carter Hotel the previous day was the defendant. The officers first went to a police station and met with the New York City police detectives who were investigating the defendant's attempted suicide. At approximately 5:30 p.m., the New Haven police officers went to the defendant's room at the Carter Hotel, where New York City police officers were already present. Mazzola looked out of the window and saw clothing and footwear on the roof in the area where the defendant had fallen some twenty-one hours earlier. He then went down to the third floor, gained access to the rooftop through one of the hotel rooms, and seized the items, including four socks.[7]
The New Haven police officers then went to St. Vincent's Hospital to question the defendant. Johnson asked the defendant if he knew why he was in the hospital, and the defendant responded that he wanted to die, that "no one cares," and that he had nothing to live for.[8] Johnson also questioned the defendant about his identity and told him about the murder. The defendant ultimately admitted that his name was not Shawn Stokes, but denied knowing about the murder. The interview lasted approximately one hour and the defendant appeared to understand the nature of the conversation.
After leaving the hospital, the police officers went to the New York City police station where the items taken from the defendant's hotel room were being held. The New York City police gave the items to the New Haven police, who brought them back to the New Haven police department. Thereafter, the New Haven police obtained a search warrant for the forensic testing of reddish-brown stains that had been found on the belt seized from the defendant's hotel room and the socks taken from the roof where he fell. The tests revealed that the substances on the belt and the socks contained DNA consistent with the victim's DNA profile.[9]
At trial, the defendant filed a motion to suppress the items of evidence seized in his hotel room and from the rooftop on the ground that they had been seized without a search warrant in violation of his constitutional *299 rights. The trial court conducted an evidentiary hearing on the motion, at which the defendant testified. When the state's attorney asked him if it was his "intention to go back and retrieve [his] clothes in [his] room," he responded, "My [intention] was to kill myself." When the defendant was asked if he ever expected to see his clothing again, he stated, "[I]f I was trying to kill myself, then I . . . think that that question answers itself." There was conflicting testimony as to whether the defendant had paid for one night or two nights at the hotel, a hotel clerk having testified that the defendant had paid for one night, and the defendant having testified that he had paid for two nights.
The trial court denied the defendant's motion to suppress, finding that the New York City police had a right to enter the hotel room because the suicide attempt constituted a "public safety issue" and they were entitled to seize the defendant's belongings for safekeeping. The court further concluded that the New Haven police had lawfully seized the defendant's socks because they were in plain view on the hotel roof twenty-one hours after the defendant's suicide attempt. Thereafter, the defendant filed a motion for articulation of the trial court's reasons for denying his motion to suppress, which the trial court granted. In its articulation, the trial court stated that it had denied the motion because it concluded that the defendant had abandoned any expectation of privacy in the items in his hotel room and on the rooftop when he jumped out of the window of the hotel room. In addition, the court stated that it had been guided by the principle that there is an exception to the fourth amendment requirement for a search warrant when a search is conducted pursuant to an emergency. On appeal, the defendant contends that the trial court improperly found that: (1) he had no reasonable expectation of privacy in the items taken from his hotel room and from the rooftop; and (2) even if he did have a reasonable expectation of privacy, the seizure of the items fell into an exception to the constitutional requirement for a search warrant.
We begin our analysis with the standard of review. "[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however]. . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence.. . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts [found by the trial court]. . . ." (Internal quotation marks omitted.) State v. Boyd, 295 Conn. 707, 717, 992 A.2d 1071 (2010), cert. denied, ___ U.S. ___, 131 S.Ct. 1474, 179 L.Ed.2d 314 (2011).
"A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property. . . . If a seizure has occurred, then the court must engage in a complex inquiry to determine whether that seizure was reasonable. . . .
"With regard to the reasonableness requirement, [i]n the ordinary case, the [United States Supreme] Court has viewed a seizure of personal property as per se unreasonable within the meaning of the [f]ourth [a]mendment unless it is accomplished pursuant to a judicial warrant issued *300 upon probable cause and particularly describing the items to be seized. . . . [That court] has nonetheless made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [c]ourt has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." (Citations omitted; internal quotation marks omitted.) Fleming v. Bridgeport, 284 Conn. 502, 520-21, 935 A.2d 126 (2007).
In determining whether a person has a reasonable expectation of privacy in an invaded place or seized effect, "a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises or seized property]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances. . . . The burden of proving the existence of a reasonable expectation of privacy rests on the defendant." (Citation omitted; internal quotation marks omitted.) State v. Boyd, supra, 295 Conn. at 718, 992 A.2d 1071.
This court previously has held that, "[w]here the presence of the police is lawful and [the defendant has left property] in a public place where the defendant cannot reasonably have any continued expectancy of privacy in the discarded property, the property will be deemed abandoned for purposes of search and seizure." (Internal quotation marks omitted.) State v. Oquendo, 223 Conn. 635, 658, 613 A.2d 1300 (1992). "The fourth amendment's protections. . . do not extend to abandoned property." (Internal quotation marks omitted.) United States v. Lee, 916 F.2d 814, 818 (2d Cir.1990).
Although courts occasionally have "used the term abandonment in its common law sense of a voluntary and intentional renunciation of ownership . . . it is clear that the proper test for abandonment in the search and seizure context is distinct from the property law notion of abandonment: it is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object." (Citation omitted; internal quotation marks omitted.) State v. Mooney, 218 Conn. 85, 106-107, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991). Accordingly, "[a]lthough whether a reasonable person would view property to have been abandoned may be relevant to whether the owner or possessor had abandoned his expectation of privacy therein, that is not the end of the inquiry for fourth amendment purposes. The test is whether, under all the facts, the owner or possessor may fairly be deemed as a matter of law to have relinquished his expectation of privacy in the object [or area] in question. . . ." Id., at 108, 588 A.2d 145. Abandonment may be found when the specific facts and circumstances of the case show an "element of conduct manifesting [an] intent to relinquish an expectation of privacy in the [item or area searched]." Id., at 109, 588 A.2d 145.

A
With these basic principles in mind, we first address whether the defendant had a reasonable expectation of privacy in the hotel room and the personal effects that he kept there and, if so, whether *301 the search of that room, the seizure of his clothing and the transfer of the clothing from the New York City police to the New Haven police fall within any exception to the constitutional requirement for a search warrant.[10] A person who has rented a hotel room generally has a reasonable expectation of privacy in that location. State v. Benton, 206 Conn. 90, 95, 536 A.2d 572, cert. denied, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988). A person who leaves a hotel room without any intent to return to it, however, has relinquished any such expectation of privacy. United States v. Gulma, 563 F.2d 386, 389-90 (9th Cir.1977) (when defendant relinquished key to motel room to confederate and had no intent to return to room, defendant had no reasonable expectation of privacy in room); United States v. James, United States District Court, Docket No. CR-06-0265 (D.Minn. January 3, 2007) (when defendant fled hotel room with no intent to return, room was abandoned for fourth amendment purposes even though defendant had reserved room through next day); People v. Parson, 44 Cal.4th 332, 345, 187 P.3d 1, 79 Cal.Rptr.3d 269 (2008) ("when a day-to-day room guest of a hotel or motel departs without any intention of occupying the room any longer and without making any arrangement for payment of his bill, an inference arises that he has abandoned his tenancy" [internal quotation marks omitted]), cert. denied, 556 U.S. 1185, 129 S.Ct. 1984, 173 L.Ed.2d 1090 (2009); Commonwealth v. Paszko, 391 Mass. 164, 185, 461 N.E.2d 222 (1984) (when evidence supported inference that, at time of search, defendant had no intent to return to motel room, defendant had abandoned expectation of privacy in room even though rental period had not expired).
In the present case, the defendant manifested an intent never to return to his hotel room when he jumped out of the hotel window in an attempt to kill himself. Moreover, there is no reason to believe that, when he fortuitously survived the fall, his intent to return to the room was somehow revived. Indeed, within one day after jumping out of the window, the defendant was conscious and capable of having a sustained, intelligent conversation with the police, and he expressed no interest at that time, or, as far as the record shows, at any later time, either in returning to the hotel room, in regaining possession of the items that he had left there or in arranging for another person to retrieve the items for him. Accordingly, we conclude that the defendant had no reasonable expectation of privacy in the hotel room or in the personal effects that he had left there after jumping out of the window.
Moreover, even if the defendant had not manifested a subjective intent to abandon the hotel room when he left it by way of the window, we conclude that the trial court properly found that the police officers' initial entry into the hotel room was justified under the emergency exception to the warrant requirement. This exception "allows police to enter a *302 home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." (Internal quotation marks omitted.) State v. Fausel, 295 Conn. 785, 794, 993 A.2d 455 (2010). Under this exception, "the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings. . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Internal quotation marks omitted.) Id., at 795, 993 A.2d 455. "The state bears the burden of demonstrating that a warrantless entry falls within the emergency exception." (Internal quotation marks omitted.) Id.
We conclude that, upon learning that the defendant had fallen from the hotel window, the New York City police officers reasonably could have believed that there might be other persons in the hotel room who were injured or who needed assistance. See id., at 802, 993 A.2d 455 (rejecting argument that "[a] mere concern that someone might be inside and might be in need of immediate assistance does not warrant police intrusion into a private dwelling under the emergency doctrine" as inconsistent with objectively reasonable standard [emphasis in original; internal quotation marks omitted]). The police had no way of knowing whether the defendant had jumped, had been pushed or had fallen out of the window and, if he had been pushed or fallen, whether other persons were still in the room or whether they were injured.[11] They also could not know whether there were others in the hotel room, such as small children, who would be helpless in the defendant's absence and might require their assistance. Under these circumstances, the police officers reasonably could have believed that an emergency might exist and that they would be derelict in their duty if they failed to enter the room to ensure that it was unoccupied. See id., at 800, 993 A.2d 455 ("[a]s one court usefully put it, the question is whether the officers would have been derelict in their duty had they acted otherwise" [internal quotation marks omitted]).
Thus, the police were entitled to enter the hotel room under either the abandonment doctrine or the emergency exception to the warrant requirement. In either case, they reasonably could have believed upon learning that the hotel room was unoccupied that the defendant intended to relinquish his possession and any expectation of privacy in both the room and the *303 personal effects that he had left there. Although, as the defendant claims, he may have retained an ownership interest in his belongings, he relinquished any reasonable expectation that they would be protected from observation and possession by others when he left the hotel room with no intent to return. State v. Mooney, supra, 218 Conn. at 107, 588 A.2d 145 ("it is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object" [internal quotation marks omitted]). We therefore conclude that the New York City police were not required to obtain a search warrant before seizing the defendant's clothing for safekeeping pursuant to their community caretaking function. See United States v. O'Bryant, 775 F.2d 1528, 1534 (11th Cir.1985) (police officer may reasonably seize, inspect and inventory abandoned property to deter false claims of loss made against police departments and to safeguard against theft or careless handling of property); cf. State v. Joyce, 229 Conn. 10, 14, 639 A.2d 1007 (1994) (before severely injured defendant was suspected of any crime, police seized his clothing for safekeeping pursuant to community caretaking function, and parties did not dispute constitutionality of seizure), on appeal after remand, 243 Conn. 282, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S.Ct. 1523, 140 L.Ed.2d 674 (1998).
We next consider the constitutionality of the transfer of the defendant's clothing from the New York City police to the New Haven police. Numerous courts have held that, when property has been lawfully seized by the police for safekeeping, a subsequent seizure and inspection of the seized property by a different state actor for a different purpose does not trigger fourth amendment protections, at least when the subsequent seizure does not involve a greater intrusion into the defendant's privacy interests than the initial one.[12] Although many of these cases *304 involve property that was initially seized by the police for inventorying after the defendant had been arrested and incarcerated, we can perceive no reason why a different result should be required when the owner of the property is suspected of no crime at the time of the initial seizure. In both situations, the initial seizure is pursuant to the community caretaking function of the police, not their investigatory function. See, e.g., State v. Gasparro, 194 Conn. 96, 107-108, 480 A.2d 509 (1984) ("In the performance of their community caretaking functions, the police are frequently obliged to take automobiles into their custody. . . . A standardized procedure for making a list or inventory as soon as reasonable after reaching the stationhouse not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person." [Citations omitted; internal quotation marks omitted.]), cert. denied, 474 U.S. 828, 106 S.Ct. 90, 88 L.Ed.2d 74 (1985). Accordingly, having concluded that the defendant's belongings were lawfully seized by the New York City police pursuant to their community caretaking function, we further conclude that the mere transfer of the items to the New Haven police without a search warrant did not violate the defendant's fourth amendment rights. Although the New Haven police were acting pursuant to their investigatory function, the transfer involved no additional intrusion into the defendant's privacy. It is also clear that the subsequent forensic testing of the defendant's belt did not violate the fourth amendment because the testing was performed pursuant to a search warrant. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress the evidence derived from the belt seized from his hotel room.
The defendant suggests, however, that this conclusion is inconsistent with this court's decision in State v. Joyce, supra, 229 Conn. at 10, 639 A.2d 1007. In that case, emergency medical personnel responding to a report of an explosion found the defendant standing in a nearby river. Id., at 12, 639 A.2d 1007. He had severe burn injuries and his clothes were burned and smoldering. Id. An emergency medical technician cut off the defendant's clothes in order to treat him and left the clothes by the side of the road. Id., at 12-13, 639 A.2d 1007. Local police then took possession of the clothes and brought them to the police station for safekeeping. Id., at 14, 639 A.2d 1007. The next day, after the defendant had become a criminal suspect in the explosion, the police gave the clothing to the fire marshal for forensic testing, which revealed the presence of gasoline. Id., at 14-15, 639 A.2d 1007. This court concluded that the testing of the defendant's clothing without a *305 search warrant violated article first, § 7, of the constitution of Connecticut. Id., at 27, 639 A.2d 1007.
To the extent that the defendant contends that Joyce stands for the principle that, under our state constitution, the police cannot seize abandoned property for safekeeping pursuant to their community caretaking function and then transfer the property to another state actor for use as evidence in a criminal investigation, we disagree because we conclude that this reading of Joyce is overly broad.[13] In Joyce, this court assumed that the police lawfully had seized the defendant's clothing for safekeeping. Id., at 14, 639 A.2d 1007 (trial court's finding that police had taken lawful custody of defendant's clothing pursuant to their community caretaking function was not challenged by either party on appeal). This court then concluded that, because the forensic testing of the clothing after it had been transferred to the fire marshal constituted a more intrusive search than the police initially had conducted, and no exigent circumstances or any other recognized exception to the warrant requirement existed, the additional invasion of the defendant's privacy constituted anew search subject to the constitutional requirements of probable cause and a warrant. Id., at 27, 639 A.2d 1007. In contrast, in the present case, the mere transfer of the defendant's lawfully seized clothes from the New York City police to the New Haven police did not result in any greater intrusion into the defendant's privacy than had occurred during the initial lawful seizure, and the New Haven police obtained a search warrant before they subjected the clothes to forensic testing. Accordingly, we conclude that Joyce is not applicable here.

B
We next consider whether the trial court properly denied the defendant's motion to suppress the evidence derived from the socks seized by Mazzola from the rooftop the day after the defendant had jumped out of the hotel window. The defendant contends that, contrary to the trial court's conclusion, clothing that has been removed by medical personnel for purposes of treatment cannot be deemed abandoned. The defendant presented no evidence at the suppression hearing, however, that medical personnel had removed his socks; see footnote 7 of this opinion; and made no claim that, even if the police otherwise reasonably could have believed that the defendant had abandoned the socks, the fact that they had been removed by medical personnel rendered the abandonment doctrine inapplicable. Although this claim is unpreserved, the defendant has asked this court to review any unpreserved claims pursuant to State v. Golding, 213 Conn. 233, 239-40, 567 A.2d 823 (1989).[14] Because the record is adequate *306 for review[15] and the claim is of constitutional magnitude, we conclude that it is reviewable. We further conclude that the claim fails under the third prong of Golding because there was no clear constitutional violation.
We begin our analysis by reiterating the general principle that "[w]here the presence of the police is lawful and [the property has been left] in a public place where the defendant cannot reasonably have any continued expectancy of privacy in the discarded property, the property will be deemed abandoned for purposes of search and seizure." (Internal quotation marks omitted.) State v. Oquendo, supra, 223 Conn. at 658, 613 A.2d 1300. In the present case, the presence of the New Haven police in the hotel room, from which Mazzola spotted the socks on the rooftop below, did not violate the fourth amendment because, as we have concluded, the defendant had abandoned the hotel room.[16] In addition, the rooftop was a public place, open to the view of anyone who happened to look out a window of the hotel, and it was accessible at least to hotel personnel. Moreover, the defendant's socks had been left there for approximately twenty-one hours before Mazzola seized *307 them, and the defendant expressed no interest when Johnson interviewed him in the hospital, or, as far as the record shows, at any later time, in regaining possession of the socks. Accordingly, we conclude that the socks were abandoned and therefore, unless the defendant can establish that some exception to the abandonment doctrine applied, their seizure did not implicate the fourth amendment.
In support of his claim that the abandonment doctrine does not apply to items of clothing that have been removed for purposes of emergency medical treatment, the defendant again relies on State v. Joyce, supra, 229 Conn. at 10, 639 A.2d 1007. In Joyce, this court concluded that the defendant had not manifested any intent to relinquish his expectation of privacy in the burned clothing that had been removed by medical personnel and left at the side of the road because "he merely left [it] behind him, more or less of necessity, making no attempt, however, to discard it or disassociate it from himself." (Internal quotation marks omitted.) Id., at 21, 639 A.2d 1007, quoting State v. Philbrick, 436 A.2d 844, 855 (Me.1981), on remand, 481 A.2d 488 (Me.1984); see also State v. Joyce, supra, 22 at n. 13, 639 A.2d 1007 ("the record in the present case discloses no conduct by the defendant manifesting an intent to relinquish his expectation of privacy in his clothing"). We acknowledge that this language suggests that this court concluded in Joyce that the defendant had not abandoned his clothing. As we have indicated, however, this court assumed in Joyce that the police lawfully had seized the defendant's clothes for safekeeping. State v. Joyce, supra, at 14, 639 A.2d 1007. Indeed, on a later appeal to this court after our remand in Joyce, this court explicitly rejected the defendant's claim that we had determined in the earlier appeal that taking possession of the defendant's clothing constituted an illegal seizure. State v. Joyce, 243 Conn. 282, 293, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S.Ct. 1523, 140 L.Ed.2d 674 (1998). Rather, "[t]he plain language of our decision in Joyce was limited to the determination of whether the chemical analysis constituted an illegal search." Id. It is clear, therefore, that this court believed that, for fourth amendment purposes, the defendant had relinquished his possessory interest in the clothing itself and his expectation of privacy in its outer physical appearancein other words, that he had abandoned it.[17] Otherwise, there would have been no justification for its seizure without a warrant. We conclude, therefore, that Joyce merely stands for the proposition that, when the police have lawfully seized for safekeeping an item that the owner has left in the open, not by choice but by necessity, and the police know who the owner is, the owner of the item has not relinquished any expectation that the item's hidden information will remain private.[18] Compare Holt v. United *308 States, 675 A.2d 474, 478-79 (D.C.1996) (when police seized clothes that had been removed from defendant by medical personnel so that they could treat gunshot wound, trial court properly denied motion to suppress because defendant had no expectation of privacy in outer appearance of clothes), cert. denied, 519 U.S. 866, 117 S.Ct. 176, 136 L.Ed.2d 117 (1996) with State v. Batiste, 445 So.2d 1323, 1324 (La. App.1984) (when police seized envelopes that fell from defendant's jacket in hospital emergency room where he was in semiconscious state and was being treated for gunshot wound, trial court improperly denied motion to suppress contents of envelopes because "envelopes were not transparent and were sealed [and] there was nothing to immediately indicate to the officer that the envelopes might contain marijuana").[19]
In the present case, because the defendant's socks were left for the better part of a day in a place that was open to the public, we conclude that the defendant had relinquished any reasonable expectation of privacy in the outer appearance of the socks and his possessory interest in them. Moreover, the police were lawfully present and we have concluded that no exception to the abandonment doctrine applies. We conclude, therefore, that the mere seizure of the socks did not implicate the fourth amendment. In addition, as with the testing of the defendant's belt, we conclude that the subsequent forensic testing of the socks did not violate the fourth amendment because the police obtained a search warrant for the testing. We therefore conclude that the trial court properly denied the defendant's motion to suppress the evidence derived from the socks.

II
We next address the defendant's claim that the trial court improperly denied his motion to preclude certain DNA evidence that the state had produced in an untimely manner in violation of General Statutes § 54-86k[20] and ordered a continuance *309 of the trial, sua sponte. We disagree.
The following undisputed facts and procedural history are relevant to our resolution of this claim. At some point in 2006, the state sent the defendant's belt and socks to the state forensic laboratory (laboratory) for DNA testing. For unknown reasons, the laboratory did not test the items at that time. On October 10, 2007, during jury selection, the state realized that the laboratory had not tested the items and the state resubmitted them for testing. On October 30, 2007, after the jury had been empanelled and six days before trial was scheduled to start, the state received the results of the DNA testing, which revealed the presence of the victim's DNA on both items. The state immediately gave the testing report to the defendant. The defendant then filed a motion to preclude the report as untimely under § 54-86k, which requires that DNA test results be disclosed at least twenty-one days before trial.
On November 5, 2007, the trial court conducted a hearing on the defendant's motion to preclude at which the defendant argued that the evidence should be precluded because of the late disclosure, regardless of the reason for the delay. The defendant also argued that he would need at least four weeks to obtain independent testing of the evidence. The state acknowledged that it may have lacked diligence in following up on the DNA testing,[21] but argued that there had been no bad faith or intent to conceal the evidence. The state agreed that the court should grant a continuance so that the defendant could perform independent tests of the evidence, but argued that, in the absence of any showing of bad faith, the evidence should not be precluded.
The trial court concluded that there was no bad faith or intent to conceal the evidence on the part of the state and denied the defendant's motion to preclude the evidence. The court also concluded that any prejudice to the defendant could be avoided if he was provided with additional time to obtain independent testing of the evidence and to prepare a new trial strategy and, therefore, ordered a continuance of the trial without specifying a new trial date. The trial ultimately began on December 10, 2007, forty-one days after the defendant received the DNA report from the state. The defendant claims on appeal that the trial court improperly denied his motion to preclude the evidence when the state had failed to establish good cause for the late disclosure.
Whether to grant a motion to preclude evidence that was untimely disclosed is a matter within the discretion of the trial court. Viera v. Cohen, 283 Conn. 412, 457, 927 A.2d 843 (2007); see also Berry v. Loiseau, 223 Conn. 786, 800, 614 A.2d 414 (1992) ("[a] trial court's decision on whether to impose the sanction of excluding the testimony of a party's expert witness rests within the court's sound discretion" [internal quotation marks omitted]). "The action of the trial court is not to be disturbed unless it has abused its broad discretion, and in determining whether there has been such abuse every reasonable presumption should be made in favor of its correctness." (Internal quotation marks omitted.) Berry v. Loiseau, supra, at 800, 614 A.2d 414.
*310 We conclude in the present case that the trial court did not abuse its discretion when it denied the defendant's motion to preclude the DNA testing results produced by the state shortly before trial was scheduled to begin. In essence, the defendant requests that we presume bad faith whenever the state has failed to comply with the timing requirements of § 54-86k, and that we require preclusion of untimely disclosed DNA evidence regardless of whether the defendant has suffered any prejudice.[22] By its express terms, however, § 54-86k permits the trial court to order a continuance if the state has failed to comply with the timing requirements of the statute, unless "appropriate circumstances" justify barring the evidence.[23] In general, the trial court should avoid a drastic remedy if a less severe remedy is sufficient to obviate any prejudice. See, e.g., State v. Ortiz, 280 Conn. 686, 702, 911 A.2d 1055 (2006) ("[i]f curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided" [internal quotation marks omitted]). Because the defendant in the present case established neither that there were exceptional circumstances requiring preclusion nor that he would be prejudiced by the late disclosure even if the trial court granted a continuance, we conclude that the trial court properly denied his motion to preclude the DNA evidence.[24]

III
We next address the defendant's claim that the trial court improperly denied his motion to suppress the statements that he made to the New Haven police at St. Vincent's Hospital in New York City. We disagree.
The following facts that the trial court reasonably could have found are relevant *311 to our resolution of this claim. As we already have indicated, at some point during the evening of July 22, 2004, approximately twenty-four hours after the defendant had jumped out of the hotel window, the New Haven police officers went to St. Vincent's Hospital, where the defendant was being treated, to interview him. The defendant was in a surgical care unit. A New York City police officer was present in the hospital room because the defendant had attempted suicide and they did not know his identity. Before entering the hospital room, Detective Johnson of the New Haven police department spoke to a nurse who told him that the defendant was receiving pain medication, but he was "up" and was able to talk. Upon entering the room, Johnson noticed that the defendant had leg injuries, that he had bandages on his head and on one of his hands, and that he was receiving intravenous pain medication.[25] Johnson asked the New York City police officer to leave the room. He then asked the defendant if he knew why he was in the hospital, and the defendant responded that he wanted to die and had nothing to live for. When Johnson asked the defendant his name, the defendant said that it was Shawn Stokes. Johnson told the defendant that he did not believe him. During this discussion, the defendant did not indicate that he did not want to speak with Johnson, and Johnson never told that defendant that he was under arrest.
After approximately thirty minutes, the defendant admitted his identity, at which point Johnson read him a standard Miranda[26] waiver. The defendant declined to sign the waiver, but indicated that he was willing to talk to Johnson and asked why he was under arrest. Johnson told the defendant that he was not under arrest, and then asked him if he knew what had happened to the victim. When the defendant said that he did not know, Johnson told him that she had been murdered. The defendant showed no emotion, but just looked up at Johnson and said, "[S]he was murdered?" Johnson then asked the defendant when he had last seen the victim, and the defendant said that he had been at the victim's apartment on Sunday, July 18, 2004. The entire interview lasted approximately one hour. Johnson testified that, during the interview, the defendant "was clear and he understood everything that [Johnson] was saying."
Before trial, the defendant filed a motion to suppress the statements that he made to Johnson while he was in the hospital on the grounds that he had been interrogated without being advised of his constitutional right to remain silent and that any waiver of that right and subsequent statements made during the course of the interrogation were neither voluntary nor intelligent because of his serious injuries and the pain medication that he was receiving. The trial court conducted an evidentiary hearing on the motion to suppress and ultimately denied it. Thereafter, Johnson testified about his interview of the defendant while he was in the hospital.
After this appeal was filed, the defendant filed a motion for articulation of the reasons for the denial of his motion to suppress, which the trial court granted. In the articulation, the trial court found that the defendant was not in custody when he made the statements because "[t]he only restraints placed upon him at *312 the time of the interview were those attendant to medical treatment occasioned by the defendant's suicide attempt." The court further found that the only statement that the defendant made before waiving his rights was giving his name, which was not an incriminatory statement, and his Miranda waiver was knowing and intelligent. On appeal, the defendant claims that the trial court improperly denied his motion to suppress Johnson's testimony regarding his statements on the ground that the statements were not the product of a custodial interrogation and were voluntary.
We first consider whether the trial court properly found that the defendant was not in custody. "Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by Miranda: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . [A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether Miranda rights are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest. . . .
"Furthermore, we note that [n]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. Because, however, the Miranda court expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere containing inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely . . . circumstances relating to those kinds of concerns are highly relevant on the custody issue. . . .
"The defendant bears the burden of proving custodial interrogation. . . . The trial court's determination of the historical circumstances surrounding the defendant's interrogation are findings of fact. . . which will not be overturned unless they are clearly erroneous. . . . In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of circumstances, the trial court's finding is supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) State v. Atkinson, 235 Conn. 748, 757-59, 670 A.2d 276 (1996). The ultimate inquiry as to whether, in light of these factual circumstances, "a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest"; id., at 758, 670 A.2d 276; "calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo." State v. Kirby, 280 Conn. 361, 394, 908 A.2d 506 (2006).
When a defendant has been questioned by the police in a hospital, factors that this court has considered in determining whether the defendant was in custody for Miranda purposes include whether the police "physically restrained the defendant in any way or ordered the medical attendants *313 to restrain him physically"; State v. DesLaurier, 230 Conn. 572, 579, 646 A.2d 108 (1994); whether the police "took advantage of an inherently coercive situation created by any physical restraint that the medical attendants may have asserted against him for purposes of his treatment"; id.; whether the defendant was able "to converse with . . . other people, express annoyance or request assistance from them"; id., at 581, 646 A.2d 108; and the duration of the questioning. Id. Other factors that courts have considered include whether "the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, [or] arranged an extended treatment schedule with the doctors"; United States v. Martin, 781 F.2d 671, 673 (9th Cir.1985); and the time of day, the "mood and mode" of the questioning, whether there were indicia of formal arrest, and the defendant's age, intelligence and mental makeup. People v. Vasquez, 393 Ill.App.3d 185, 192, 332 Ill.Dec. 465, 913 N.E.2d 60 (2009).
In the present case, the defendant was immobilized for medical treatment, not for purposes of interrogation; there was no evidence that the defendant could not have asked the police to leave the hospital room or asked hospital personnel to assist him to terminate the questioning; State v. DesLaurier, supra, 230 Conn. at 581, 646 A.2d 108 (suspect's ability "to converse with . . . other people, express annoyance or request assistance from them" supports finding that suspect was not in custody); the police did not arrange for any restraints on or extended treatment of the defendant by medical personnel; id., at 579, 646 A.2d 108; the questioning was neither prolonged nor aggressive; see People v. Vasquez, supra, 393 Ill.App.3d at 192, 332 Ill.Dec. 465, 913 N.E.2d 60 (questioning for thirty-five minutes in hospital "is not atypical of noncustodial interviews"); and Johnson told the defendant that he was not under arrest. Although the New York City police accompanied the defendant to the hospital and remained with him there until Johnson entered the hospital room, the reason for their presence was his suicide attempt, not their belief that he had been involved in a crime. See State v. Szabo, 166 Conn. 289, 293-94, 348 A.2d 588 (1974) (when police accompanied defendant to hospital in ambulance, defendant was not in custody when "police were unaware that a crime had been committed, they had not yet shifted from their investigation of a relatively routine mishap to accusatorial criminal police work or focused upon the defendant as a potential target of criminal allegations"). Thus, there was no reason for the defendant to feel intimidated by the presence of the police inside the hospital room before Johnson arrived and outside the room thereafter. Finally, with respect to the defendant's age, intelligence and mental makeup, there is no evidence that his age or intelligence rendered him especially vulnerable to police intimidation and, although he may have been despondent and was receiving pain medication for his injuries, the nurse indicated that he was capable of speaking with the police, and Johnson testified that he was alert and coherent. We conclude that a reasonable person in these circumstances would not believe that "he or she was in police custody of the degree associated with a formal arrest." (Internal quotation marks omitted.) State v. Atkinson, supra, 235 Conn. at 758, 670 A.2d 276. Accordingly, we conclude that the trial court properly determined that the defendant was not in custody for purposes of triggering the Miranda requirements.
We next consider whether the defendant's statements to the police were *314 voluntary.[27] "Whether a confession is involuntary because it was coerced rests upon factual determinations regarding the circumstances surrounding the defendant's confession. . . . Although the ultimate question of voluntariness is one of law over which our review is plenary, the factual findings underpinning that determination will not be overturned unless they are clearly erroneous. . . . As in other cases in which the factual findings implicate a defendant's constitutional rights and the credibility of witnesses is not the primary issue, we will, however, undertake a scrupulous examination of the record to ensure that the findings are supported by substantial evidence." (Citations omitted.) State v. Mullins, 288 Conn. 345, 358, 952 A.2d 784 (2008).
"The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . including both the characteristics of the accused and the details of the interrogation. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the federal constitution . . . coercive police activity is a necessary predicate to the finding that a confession is not voluntary. . . ." (Citations omitted; internal quotation marks omitted.) State v. Correa, 241 Conn. 322, 328, 696 A.2d 944 (1997). The state is required to prove the voluntariness of a confession by a preponderance of the evidence. State v. Lawrence, 282 Conn. 141, 177, 920 A.2d 236 (2007).
As the foregoing demonstrates, there is considerable overlap between the factors that courts should consider in determining whether a defendant is in custody for Miranda purposes and the factors that courts should consider in determining whether a defendant's statements were voluntary. Accordingly, for the same reasons that we have concluded that the defendant was not in custody when he gave his statements to the police while he was hospitalized, we conclude that his statements to the police were voluntary. See State v. Roseboro, 221 Conn. 430, 442-43, 604 A.2d 1286 (1992) (when defendant was questioned in hospital after undergoing surgery and while medicated, statements were voluntary when police relied on nursing personnel for determination that defendant was lucid, defendant had been advised of Miranda rights on previous occasions, defendant *315 readily answered questions, interviews were of relatively short duration and defendant seemed alert); compare Mincey v. Arizona, 437 U.S. 385, 398-400, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (statements to police determined to be involuntary when hospitalized defendant was "`depressed almost to the point of coma,'" had "`unbearable'" leg pain, was "evidently confused and unable to think clearly about either the events [under investigation] or the circumstances of his investigation," and had repeatedly and "clearly expressed his wish not to be interrogated"). Having concluded that the defendant was not in custody when Johnson questioned him in the hospital and that his statements to Johnson were voluntary, we conclude that the trial court properly denied the defendant's motion to suppress those statements.

IV
Finally, we address the defendant's claim that the trial court improperly denied his request to charge the jury on third party culpability. We disagree.
The record reveals the following facts that the trial court reasonably could have found that are relevant to our resolution of this claim. Jackson testified that he spent the night of Monday, July 19, 2004, with the victim, and dropped her off near her apartment at approximately 2:30 p.m. on Tuesday, July 20, 2004. Jackson also testified that he went to work after bringing the victim home, although the evidence showed that he usually did not work on Tuesdays. Alvarez testified that someone was in the hallway outside the victim's apartment at around midnight on July 20, 2004.
Jackson further testified that, when he went to the victim's apartment in the early morning hours of July 22, 2004, he attempted unsuccessfully to open certain windows in an attempt to gain entry. A New Haven firefighter entered the victim's apartment through an unlocked window. When police interviewed Jackson at the scene of the murder, Jackson told them that the victim was the defendant's girlfriend. He also told the police that he was the victim's friend. Jackson testified at trial that he did not tell the police that he was in a romantic relationship with the victim because they never asked him. Jackson's conversation with the police at the scene of the murder lasted approximately one minute.[28]
On the basis of this evidence, the defendant submitted to the trial court a request to charge on the issue of third party culpability.[29] The trial court denied the *316 request. On appeal, the defendant contends that the trial court improperly determined that the instruction on third party culpability was not supported by the evidence and that the trial court's refusal to charge the jury violated his constitutional right to raise a defense.
"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Internal quotation marks omitted.) State v. Arroyo, 284 Conn. 597, 607-608, 935 A.2d 975 (2007).
"It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Internal quotation marks omitted.) Id., at 609, 935 A.2d 975.
"Because the standards governing the admissibility of third party culpability evidence require that the trial court determine that such evidence be relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt, we conclude that those same standards should govern whether a trial court should give an appropriate instruction on third party culpability. Put another way, if the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, a trial court has a duty to submit an appropriate charge to the jury." Id., at 610, 935 A.2d 975. The trial court's determination as to whether evidence of third party culpability is relevant and probative is subject to review for an abuse of discretion. State v. Ferguson, 260 Conn. 339, 354, 796 A.2d 1118 (2002).
We conclude that the trial court in the present case did not abuse its discretion when it determined that the evidence of third party culpability did not establish a direct connection between Jackson and the victim's murder. Indeed, we find it questionable whether the evidence raised even a bare suspicion that Jackson might have committed the crime. First, we do not agree with the defendant that the fact that Jackson claimed that he went to work after dropping the victim off at her apartment at approximately 2:30 p.m. on Tuesday, July 20, 2004, even though he ordinarily did not work on Tuesdays, supports an inference that he was the person who Alvarez heard in the hallway of the apartment building near midnight that evening. Even if we were to assume that the evidence could support a very tenuous inference that Jackson lied about going to work after dropping the victim off, there was no evidence that he was in the victim's *317 apartment that evening, while there was ample evidence that the defendant was there.[30] Cf. Paige v. St. Andrew's Roman Catholic Church Corp., 250 Conn. 14, 18, 734 A.2d 85 (1999) ("it is well established that, although the [fact finder] is entitled to disbelieve any evidence, it may not draw a contrary inference on the basis of that disbelief").
With respect to the possible minor inconsistency in the evidence as to whether one of the windows to the victim's apartment was unlocked, the defendant has failed to explain in any way how this inconsistency would support an inference that Jackson killed the victim. See, e.g., Connecticut Light & Power Co. v. Dept. of Public Utility Control, 266 Conn. 108, 120, 830 A.2d 1121 (2003) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" [internal quotation marks omitted]). With respect to Jackson's statement to the police, we conclude that the fact that, during his one minute conversation with the police at the murder scene, he described himself as the victim's friend and described the defendant, who was the father of the victim's child and who had been living in the victim's apartment, as her "boyfriend," instead of providing a detailed explanation of their respective relationships, does not support an inference that he killed the victim. Moreover, the defendant has pointed to no evidence that Jackson, who had been aware for some time that the defendant had been living in the victim's apartment, had ever expressed any jealousy or anger toward the victim because of the living arrangement.[31] Accordingly, we conclude that the trial court did not abuse its discretion when it denied the defendant's request for a jury charge on the issue of third party culpability.
The judgment is affirmed.
In this opinion the other justices concurred.
NOTES
[1] The defendant brought his appeal to this court pursuant to General Statutes § 51-199(b).
[2] Jackson is not related to the defendant.
[3] The medical examiner testified that the victim's strangulation injuries were life threatening, but she was unable to determine whether strangulation was the cause of death. She also testified that the victim could not have survived more than a few hours with such a severe skull fracture. The medical examiner ultimately certified that the cause of death was multiple blunt traumatic head injuries.

The victim was pronounced dead at 1:35 a.m. on July 22, 2004, soon after her body was discovered. The medical examiner did not make a specific determination as to the time of death. She testified, however, that rigor mortis had set in when an investigator from her office arrived at the crime scene at 12:45 p.m. on July 22. The medical examiner further testified that, as a general rule, rigor mortis develops within two to three hours of death and lasts for approximately twenty-four hours, although those time periods can vary based on the decedent's level of activity before death and the ambient room temperature.
[4] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[5] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

Although the defendant relies on cases in which this court has construed the scope of article first, § 7, of the state constitution, he has not separately briefed his claim under the state constitution or argued that this provision provides broader protection than this court previously has recognized under the specific facts and circumstances of the present case. Accordingly, we limit our analysis to well established principles of state constitutional law.
[6] Moller's first name is not apparent from the record.
[7] No evidence was presented at the suppression hearing as to how the socks and other items of clothing had been removed from the defendant's body. Mazzola testified at trial that he had been told that the socks had been removed from the feet of the person who jumped out of the hotel window, but he did not indicate who had removed them.
[8] The testimony regarding the events at the hospital was provided at a hearing on the defendant's motion to suppress certain statements he made at the hospital, not at the hearing on the motion to suppress the evidence seized from the hotel. The state asked the trial court to consider this testimony in ruling on the motion to suppress the evidence seized from the hotel, however, and the trial court did so.
[9] For both the substance on the belt and the substance on the socks, the tests revealed that the expected frequency of individuals who could not be eliminated as the source of the DNA was less than one in seven billion individuals for the African-American, Hispanic and Caucasian populations.
[10] The defendant makes no claim that New York state constitutional law is different than federal constitutional law in this context. Accordingly, in determining whether the conduct of the New York police was constitutional, we apply federal fourth amendment principles.

The defendant appears to concede twice in his brief to this court that the New York City police were entitled to seize the clothing from his hotel room for safekeeping pursuant to their community caretaking function. He also argues, however, that he did not abandon the hotel room and that the emergency exception to the constitutional requirement for a warrant did not justify the police officers' entry into the room. Accordingly, it is necessary for us to explain why the police were entitled to enter the defendant's hotel room before seizing the items.
[11] Cf. Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ("when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises"); see also State v. Fausel, supra, 295 Conn. at 800, 993 A.2d 455 (emergency exception "must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences" [internal quotation marks omitted]); 3 W. LaFave, Search and Seizure (4th Ed. 2004) § 6.6(a), p. 457 ("[i]f the police learn that there has been a shooting at a particular place and that one victim has been taken to the hospital seriously wounded, the possibility that others may have been injured and may have been abandoned on the premises provides a sufficient basis for an immediate entry to render aid to anyone in distress" [internal quotation marks omitted]).
[12] See United States v. Turner, 28 F.3d 981, 983 (9th Cir.1994) (when property has been lawfully seized and searched, subsequent warrantless search of property by different state actor does not violate fourth amendment), cert. denied, 513 U.S. 1158, 115 S.Ct. 1117, 130 L.Ed.2d 1081 (1995); United States v. Thompson, 837 F.2d 673, 676 (5th Cir.) (when state police lawfully seized defendant's property for inventory search pursuant to arrest, defendant had no reasonable expectation of privacy in property and subsequent seizure by federal agent did not require warrant), cert. denied, 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988); United States v. Gargotto, 476 F.2d 1009, 1014 (6th Cir.1973) ("[e]vidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken"); Addleman v. King County, United States District Court, Docket No. CV-05-0709-JCC, 2007 WL 1430195 (W.D.Wash. May 14, 2007) ("[o]nce evidence has been validly seized, it is not a violation of the [f]ourth [a]mendment for one police agency to transfer legally seized evidence to another police agency"); Wallace v. State, 373 Md. 69, 93, 816 A.2d 883 (2003) (when defendant's belongings were taken from him after arrest for purpose of being inventoried and stored in police property room for safekeeping, subsequent warrantless inspection of belongings by different police officer in connection with investigation of second crime did not violate fourth amendment); State v. Motley, 153 N.C.App. 701, 707, 571 S.E.2d 269 (2002) (transfer of seized property from one law enforcement agency to another does not constitute search or seizure subject to constitutional scrutiny because defendant no longer possesses reasonable expectation of privacy in property once it is lawfully seized); Oles v. State, 993 S.W.2d 103, 110 (Tex.Crim. App.1999) (defendant lacks reasonable expectation of privacy in items that have been lawfully seized by police); Williams v. Commonwealth, 259 Va. 377, 386, 527 S.E.2d 131 (2000) (citing cases and stating that "when a person . . . has been lawfully arrested and his property has been lawfully seized by law enforcement personnel pursuant to that arrest, the arrestee has no reasonable expectation of privacy in that property, and later examination of the property by another law enforcement official does not violate the [f]ourth [a]mendment"); State v. Cheatam, 150 Wash.2d 626, 642, 81 P.3d 830 (2003) ("Once police have conducted a valid inventory search of an inmate's clothing and other effects at booking, and have placed them in storage for safekeeping in accord with a proper inventory procedure, the inmate has lost any privacy interest in those items that have already lawfully been exposed to police view. He or she is no longer entitled to hold a privacy interest in the already searched items free from further governmental searches. It makes no difference . . . that an investigation is being conducted into a different crime than the one the inmate was arrested for, because one's privacy interest does not change depending on which crime is under investigation once lawful exposure has already occurred."); cf. Hell's Angels Motorcycle Corp. v. Monterey, 89 F.Supp.2d 1144, 1150 (N.D.Cal.2000) (principle that defendant loses reasonable expectation of privacy in items that have been seized by police pursuant to warrant does not apply when subsequent search involves more extensive search of seized items).
[13] Although Joyce was decided pursuant to our state constitution and, therefore, would not necessarily apply to the conduct of the New York police, Joyce does apply to the conduct of the New Haven police after they received the defendant's clothing from the New York police.
[14] Under State v. Golding, supra, 213 Conn. at 239-40, 567 A.2d 823, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.)
[15] The evidence presented at the suppression hearing established that the defendant jumped out of the hotel window, that he landed on the rooftop three stories below, that he was severely injured and was treated by medical personnel on the rooftop, that he was admitted to the hospital for further treatment of his injuries, and that the socks were found in the area where he fell. Even if the record is inadequate to determine that the defendant's socks were removed by medical personnel and not by the defendant or by the force of the fall, it is reasonable to infer that the defendant left the socks on the rooftop because he required medical treatment at a hospital and he could not have personally retrieved the socks from the rooftop even if he had wanted to because of his injuries. These facts and circumstances are close enough to the facts and circumstances of cases involving the removal of clothing by medical personnel; see, e.g., State v. Joyce, supra, 229 Conn. at 12-13, 639 A.2d 1007; to permit meaningful review of the defendant's claim by this court.
[16] The defendant claims that the presence of the New Haven police was illegal because they were not authorized to search a location or seize property in New York. Because this claim was not raised at trial, we review it pursuant to State v. Golding, supra, 213 Conn. at 239-40, 567 A.2d 823. Although it may be true that the New Haven police had no statutory authority to search a location in New York; see State v. Miller, 227 Conn. 363, 370-72 and n. 11, 630 A.2d 1315 (1993) (local police have statutory authority to obtain search warrant only for location within their territorial jurisdiction); this court has rejected the argument that the constitutional "prohibition [on] unreasonable seizures encompasses the legislature's territorial restrictions on police conduct." Id., at 375, 630 A.2d 1315; see also 1 W. LaFave, Search and Seizure (4th Ed. 2004) § 1.5(b), pp. 163-64 (violation of statute requiring that warrant must be executed by officer who is within territorial jurisdiction does not violate fourth amendment). The defendant has provided no authority, and we have found none, for the proposition that a different result is required when the police conduct occurred not just in a different town, as in Miller, but in a different state. More fundamentally, we conclude in the present case that the taking of the socks did not constitute a seizure for fourth amendment purposes because they were abandoned, and the defendant has provided no authority for the proposition that Connecticut police are not authorized to travel to another state to investigate a crime or to take possession of abandoned property in a foreign jurisdiction. Even if we were to assume, however, that the police had no statutory authority to take possession of the defendant's socks under the specific circumstances of this case, we conclude that conduct by a local Connecticut police department that would be constitutional if it occurred in this state does not violate the fourth amendment merely because it occurred in another state. The fourth amendment to the United States constitution and its analog in our state constitution are intended to protect the privacy of individuals, not to guard against jurisdictional incursions.
[17] Because State v. Joyce, supra, 229 Conn. at 10, 639 A.2d 1007, was internally inconsistent to the extent that it assumed both that the defendant's clothing had been lawfully seized and that the defendant had not abandoned any expectation of privacy in the clothing, we hereby explicitly disavow our statement in that case that "the record . . . discloses no conduct by the defendant manifesting an intent to relinquish his expectation of privacy in his clothing. . . ." Id., at 22 n. 13, 639 A.2d 1007. It would have been more precise for this court to state that the defendant did not relinquish all of his expectations of privacy in the clothing when he was forced to leave it by the side of the road.
[18] This court in Joyce apparently analogized the invisible information in the defendant's clothing that could be obtained only from forensic testing to the contents of a closed container, and concluded that the defendant had not abandoned his privacy interest in that information by leaving the clothing by the side of the road. See, e.g., State v. Mooney, supra, 218 Conn. at 111-12, 588 A.2d 145 (when police had lawfully seized duffel bag, defendant was unable to reassert possessory rights in duffel bag because he was in police custody, and police knew that defendant owned duffel bag, defendant still retained expectation of privacy in contents of duffel bag).
[19] The defendant also relies on United States v. Neely, 345 F.3d 366, 370 (5th Cir.2003) (defendant did not forfeit possessory interest in his clothing by entering hospital), and People v. Tyler, 210 Ill.App.3d 833, 839, 155 Ill. Dec. 240, 569 N.E.2d 240 (1991) (defendant had reasonable expectation of privacy in clothing placed in basket under defendant's gurney at hospital). Even if we were to assume, however, that a person generally does not relinquish his or her reasonable expectation of privacy or possessory interest in personal effects by entering a hospital, it does not follow from this principle that a person retains a reasonable expectation of privacy or possessory interest in personal effects that the person has left in the open before seeking treatment in a hospital.
[20] General Statutes § 54-86k provides in relevant part: "(a) In any criminal proceedings, DNA (deoxyribonucleic acid) testing shall be deemed to be a reliable scientific technique and the evidence of a DNA profile comparison may be admitted to prove or disprove the identify of any person. . . .

"(c) At least twenty-one days prior to commencement of the proceeding in which the results of a DNA analysis will be offered as evidence, the party intending to offer the evidence shall notify the opposing party, in writing, of the intent to offer the analysis and shall provide or make available copies of the profiles and the report or statement to be introduced. In the event that such notice is not given, and the person proffers such evidence, then the court may in its discretion either allow the opposing party a continuance or, under the appropriate circumstances, bar the person from presenting such evidence.. . ."
[21] The state's attorney stated, "I don't excuse myself from being more diligent, but we were under the impression that [the evidence] was going to be tested over a year ago, it wasn't, and I suppose it was our responsibility to be aware of that, but when we became aware of it fairly recently we sent it up again."
[22] The defendant contends in his brief to this court that he was prejudiced because he "had picked a jury and prepared his case without knowing about this evidence. . . . Thirty days might be a lengthy continuance, but it is a short space of time in which to rethink and rework a defense case in a murder trial." The defendant ignores the fact, however, that the state was not required to produce the evidence until twenty-one days before trial pursuant § 54-86k. In determining whether the defendant was prejudiced by the untimely disclosure, we must compare what actually happened with what should have happened. In fact, the trial did not start until forty-one days after the state disclosed the DNA evidence. Because this was a longer period than required by statute, we fail to see how the defendant could have been prejudiced by the state's failure to comply with the statute. To the extent that the defendant claims that he should have been allowed to pick an entirely new jury after the state disclosed the new evidence, any such claim was not preserved for review, and the defendant does not seek review of that claim under Golding.
[23] We decline the defendant's invitation to exercise our supervisory powers to adopt a rule requiring the preclusion of DNA evidence whenever the state has negligently failed to disclose the evidence in a timely manner. "[O]ur supervisory powers are invoked only in the rare circumstance [in which the] traditional protections are inadequate to ensure the fair and just administration of the courts. . . ." (Internal quotation marks omitted.) Smith v. Andrews, 289 Conn. 61, 79, 959 A.2d 597 (2008). Although preclusion of the evidence may be appropriate as a punitive sanction if the state withholds DNA evidence in bad faith, the granting of a continuance ordinarily will be an adequate remedy when the nondisclosure was unintentional.
[24] On appeal, the defendant has pointed to no evidence that, even if the trial court reasonably could have believed that he would suffer no prejudice as a result of the late disclosure if the court granted a continuance, he was in fact prejudiced for reasons that the court could not have foreseen. The only prejudice that he points to is the delay of the trial itself. If that were sufficient harm to warrant reversal, however, the granting of a continuance would never be an appropriate remedy.
[25] Johnson did not testify as to the nature of the injuries to the defendant's legs and arm at the suppression hearing. He did testify, however, at trial that the defendant had broken his legs and one of his arms.
[26] See Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[27] The defendant appears to assume that the trial court could not have found that his statements to the police in the hospital were involuntary unless it found that he was in custody, while the state appears to assume that, even if the defendant was in custody, if the defendant voluntarily waived his Miranda rights, any subsequent statements would not have been involuntary. Whether the defendant was in custody and whether the defendant's statements were voluntary are, although related, analytically separate inquiries. State v. Porter, 178 Ohio App.3d 304, 310, 897 N.E.2d 1149 (2008) ("[v]oluntariness of a confession and compliance with Miranda are analytically separate inquiries"), appeal denied, 120 Ohio St.3d 1525, 901 N.E.2d 245 (2009). A statement may be suppressed as involuntary even if the defendant was not in custody, and even if the defendant was in custody but waived his Miranda rights. Id., at 311, 897 N.E.2d 1149 ("[a] confession may be involuntary even when Miranda warnings are given, or even if Miranda warnings are not required"). Conversely, the mere fact that the defendant was in custody does not mean that his waiver of rights and his statement were involuntary. See State v. Jenkins, 298 Conn. 209, 251, 3 A.3d 806 (2010) ("the fact of custody alone has never been enough in itself to demonstrate a coerced confession" [internal quotation marks omitted]).
[28] The defendant points out that he later gave a tape-recorded statement to Johnson at the New Haven police department. The substance of that interview, however, was not in evidence.
[29] The defendant submitted the following request to charge: "You have heard evidence in this case that someone other than [the defendant] committed this crime. This type of evidence is known as third party guilt.

"As I have already made clear to you, the [s]tate has the burden of proving the [d]efendant's guilt beyond a reasonable doubt. It must prove all of the elements of the crime, including that it was the [d]efendant and not some other person, who was the perpetrator. This burden rests on the state at all times; the [d]efendant has no burden of proof whatsoever, on this or any other issue.
"The question presented by third party culpability evidence is not whether the guilt of another person has been proven, but whether, after a full consideration of all of the evidence in this case, there is a reasonable doubt that [the defendant] was the perpetrator. Evidence that a third party may have committed this crime may, if credited, tend to raise a reasonable doubt as to . . . whether the [s]tate has met it's required burden to prove the identity of the [d]efendant as the perpetrator. If, after considering all of the evidence, you have a reasonable doubt as to the [d]efendant's guilt, you must find the [d]efendant not guilty."
[30] The defendant contends that it is absurd for the state to argue that the defendant brutally murdered the victim at approximately 5 p.m. on July 20, 2004, and then stayed at the crime scene for seven hours before leaving at midnight. Even if that were truewhich we do not believeit is even more absurd for the defendant to argue that, because he would not have been in the hallway at midnight if he had murdered the victim at 5 p.m., Jackson must have been in the hallway. The defendant has pointed to no evidence to support that inference.
[31] The defendant counters that the state failed to establish that he had any motive to kill the victim. The undisputed evidence shows, however, that the victim and the defendant had had an intimate relationship at one time and had a child together, that the victim asked the defendant to move out of her apartment on July 20, 2004, that the defendant and the victim had a violent argument at approximately 5 p.m. on that date, that they engaged in sexual relations at some point between the time that the defendant entered the apartment at approximately 4:30 p.m. and the time that he left the apartment to go to the Carter Hotel, and that the defendant stated that he jumped out of the hotel window the next day because no one cared about him. This evidence amply supports an inference that the defendant was distraught over the victim's termination of her relationship with him or her termination of his living arrangement, or both.