******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ADA MANGUAL
(SC 18842)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh and Vertefeuille, Js.*

Argued December 4, 2012—officially released March 4, 2014

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, and *Brett J. Salafia*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Ada Mangual, guilty of possession of narcotics with the intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), and possession of narcotics with the intent to sell within 1500 feet of a public school in violation of General Statutes § 21a-278a (b), following a police investigation that culminated in the seizure of a quantity of heroin from the defendant's home pursuant to a duly authorized search warrant. The trial court rendered judgment in accordance with the jury verdict and imposed a total effective sentence of eight years imprisonment. On appeal to the Appellate Court, the defendant challenged, inter alia, the trial court's denial of her motion to suppress certain statements, claiming that those statements had been obtained in violation of her rights under the fifth and fourteenth amendments to the United States constitution when a police officer questioned her during the execution of the search warrant without first advising her of her rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).[1] The Appellate Court rejected the defendant's claim upon concluding that the trial court properly determined that the defendant was not in custody for purposes of *Miranda* at the time of the police questioning and that, as a result, *Miranda* warnings were not required. See *State* v. *Mangual*, 129 Conn. App. 638, 642, 648–49, 21 A.3d 510 (2011). The Appellate Court therefore affirmed the judgment of the trial court; id., 651; and we granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the defendant was not in custody for purposes of *Miranda* when a police officer interrogated her during the execution of a search warrant on her residence?" *State* v. *Mangual*, 302 Conn. 916, 27 A.3d 368 (2011). We agree with the defendant that she was in custody when the officer questioned her and, consequently, that the police were required to advise her in accordance with *Miranda*. Because we also agree with the defendant that the *Miranda* violation was not harmless beyond a reasonable doubt, we conclude that the defendant is entitled to a new trial. We therefore reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that are relevant to the defendant's claim. "In January, 2008, Officer John Blackmore of the New Britain [P]olice [D]epartment (department) received information from a confidential informant that heroin was being sold from an apartment in a multifamily residence located on North Street in [the city of] New Britain. After receiving this information, the department began surveillance of the apartment. In addition to surveillance, the department also used confidential informants to make three controlled purchases of heroin

from the apartment. On the basis of information gathered from these investigative activities, the department suspected that three individuals, including a Hispanic male named 'Bebo' and a woman named 'Ada,' were selling heroin from the apartment.

"Blackmore obtained a search and seizure warrant for the apartment, which the police executed on February 5, 2008. In executing the warrant, Blackmore and [three] other officers [who were equipped with handguns, tactical vests, and at least one rifle] entered the multifamily residence and proceeded to the apartment, while Officer Gerald Hicks . . . and two other uniformed officers remained outside. After reaching the apartment, an officer knocked on the front door and advised the occupants of the warrant. The defendant answered the door and allowed the officers [to enter, some of whom did so with their weapons drawn]. Upon entry, the officers [removed the defendant's dog from the four room apartment and guided] the defendant and [her three daughters] into the living room area.[2] [All four occupants were ordered to remain on the couch in the living room and were kept under police observation for the duration of the search.]

"After the apartment was secured, Hicks [and the two other officers] proceeded inside. Without issuing a *Miranda* warning [or informing the defendant whether she was under arrest or merely being detained temporarily until the officers completed the search], Hicks asked the defendant 'if there [were] any drugs or weapons in the apartment.' " (Footnotes altered.) *State* v. *Mangual*, supra, 129 Conn. App. 640–41. "The defendant answered 'yes' and informed [Hicks] that '[there were] drugs in the bedroom.' Thereafter, the defendant led Hicks to her bedroom . . . [where she] pointed [to a] can of hairspray"; id., 643; that was "located on her dresser and stated that it contained heroin. After removing the can's false bottom, Hicks discovered 235 packets of heroin.[3] The defendant was placed under arrest."[4] (Footnote added.) Id., 641.

Prior to trial, the defendant filed a motion to suppress her statements in response to Hicks' inquiry on the ground that she had not been advised of her *Miranda* rights before being questioned.[5] After an evidentiary hearing on the motion, the trial court determined that the defendant was not in custody when Hicks questioned her and, consequently, that the police were not required to issue *Miranda* warnings. In support of its brief oral ruling, the trial court stated that, "although [the defendant] was confined to a certain area," she was not handcuffed, and the police "had every right to secure the apartment and . . . to ensure their safety by . . . making everyone stay where they were." In accordance with this ruling, Hicks was permitted to testify at trial that the defendant had told him that there were drugs in her bedroom and that she had led him

to the hairspray can on her dresser that contained those drugs. The jury subsequently found the defendant guilty of possession of narcotics with the intent to sell by a person who is not drug-dependent and possession of narcotics with the intent to sell within 1500 feet of a public school.

On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court improperly denied her motion to suppress because she was in custody when Hicks questioned her without first issuing *Miranda* warnings.[6] *State* v. *Mangual*, supra, 129 Conn. App. 642. The Appellate Court rejected the defendant's claim, concluding that she had not demonstrated, as *Miranda* requires, "that a reasonable person in the defendant's position would have believed that she was in police custody of the degree associated with [a] formal arrest." Id., 647. In reaching this determination, the Appellate Court observed that Hicks' questioning was limited in scope and duration, the defendant was in the familiar surroundings of her apartment, she was not restrained physically, and she had not been threatened or told that she was under arrest. Id., 647–48. The Appellate Court also relied on *Michigan* v. *Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981); see *State* v. *Mangual*, supra, 648; in which the United States Supreme Court held that, for purposes of the fourth amendment, police executing a search warrant for a home may detain the occupants during the search; *Michigan* v. *Summers*, supra, 705; and observed that the detention of the respondent in that case was "substantially less intrusive" than an arrest. (Internal quotation marks omitted.) Id., 702. On the basis of this distinction between a formal arrest and the detention of the occupant of a home incident to the execution of a search warrant, the Appellate Court reasoned that "a defendant is normally not in custody, and . . . *Miranda* warnings are not required, when he or she is detained during the execution of a search warrant." *State* v. *Mangual*, supra, 648. The Appellate Court ultimately concluded that "the trial court did not make any factual findings that would lead [the Appellate Court] to conclude that the defendant was subject to greater constraints on her freedom of movement than those normally occurring during the execution of a search . . . warrant." Id.

On appeal to this court following our grant of certification, the defendant claims that (1) the Appellate Court incorrectly concluded that the trial court properly had denied her motion to suppress because, contrary to the conclusion of those courts, she was in custody for purposes of *Miranda* when Hicks questioned her, and (2) the resulting use of her statements by the state constituted harmful error requiring a new trial. We agree with both of the defendant's contentions.

I

We first address the defendant's claim that she was entitled to suppression of her statements because she had not been advised of her *Miranda* rights before Hicks elicited those statements, even though she was in police custody at that time. We agree that she was in custody, and, therefore, the police were required to administer *Miranda* warnings prior to any questioning.[7]

The following principles concerning the requirement of *Miranda* warnings govern our analysis of the defendant's claim. Although "[a]ny [police] interview of [an individual] suspected of a crime . . . [has] coercive aspects to it"; *Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); only an interrogation that occurs when a suspect is in custody "heightens the risk" that statements obtained therefrom are not the product of the suspect's free choice. *Dickerson* v. *United States*, 530 U.S. 428, 435, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). This is so because "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements . . . ." Id. Thus, the court in *Miranda* was concerned "with protecting defendants against interrogations that take place in a police-dominated atmosphere, containing inherently compelling pressures [that] work to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely . . . *Miranda* v. *Arizona*, supra, 384 U.S. 445, 467 . . . ." (Internal quotation marks omitted.) *State* v. *DesLaurier*, 230 Conn. 572, 577–78, 646 A.2d 108 (1994). "By adequately and effectively appris[ing] [a suspect] of his rights and reassuring the suspect that the exercise of those rights must be fully honored, the *Miranda* warnings combat [the] pressures inherent in custodial interrogations. *Miranda* v. *Arizona*, [supra, 467]. In so doing, they enhance the trustworthiness of any statements that may be elicited during an interrogation."[8] (Internal quotation marks omitted.) *In re Terrorist Bombings of United States Embassies in East Africa*, 552 F.3d 177, 202 (2d Cir. 2008); see also *State* v. *Barrett*, 205 Conn. 437, 447, 534 A.2d 219 (1987) (*Miranda* warnings "significantly enhance [a suspect's] opportunity to make a knowing, intelligent and voluntary decision whether to speak or remain silent"). Consequently, "police officers are not required to administer *Miranda* warnings to everyone whom they question"; *Oregon* v. *Mathiason*, supra, 429 U.S. 495; rather, they must provide such warnings only to persons who are subject to custodial interrogation. See, e.g., *Miranda* v. *Arizona*, supra, 444. To establish entitlement to *Miranda* warnings, therefore, the defendant must satisfy two conditions, namely, that (1) he was in custody when the statements were made, and (2) the statements were obtained in response to police questioning.[9] E.g., *State* v. *Britton*, 283 Conn. 598, 604, 929 A.2d 312 (2007). Because the state does not challenge the defendant's contention that her statements were made in response

to Hicks' questioning, the issue we must decide in the present case is whether the defendant was in custody when that questioning occurred.[10]

To resolve that issue, we first must consider what it means to be in custody for purposes of *Miranda*, a task that quite accurately has been characterized as "slippery . . . ." *Oregon* v. *Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). "As used in . . . *Miranda* [and its progeny], 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes* v. *Fields*, U.S. , 132 S. Ct. 1181, 1189, 182 L. Ed. 2d 17 (2012). "In determining whether a person is in custody in this sense"; id.; the United States Supreme Court has adopted an " 'objective, reasonable person test' "; *State* v. *Britton*, supra, 283 Conn. 604; "the initial step [of which] is to ascertain whether, in light of the objective circumstances of the interrogation, *Stansbury* v. *California*, 511 U.S. 318, [323, 114 S. Ct. 1526, 128 L. Ed. 2d 293] (1994) . . . a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave. *Thompson* v. *Keohane*, 516 U.S. 99, 112 [116 S. Ct. 457, 133 L. Ed. 2d 383] (1995)." (Internal quotation marks omitted.) *Howes* v. *Fields*, supra, 1189. "Determining whether an individual's freedom of movement [has been] curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry, *Berkemer* [v. *McCarty*, 468 U.S. 420, 437, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)], and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[11] (Internal quotation marks omitted.) *Howes* v. *Fields*, supra, 1189–90.

Of course, the clearest example of custody for purposes of *Miranda* occurs when a suspect has been formally arrested. As *Miranda* makes clear, however, custodial interrogation includes questioning initiated by law enforcement officers after a suspect has been arrested *or* "otherwise deprived of his freedom of action *in any significant way*." (Emphasis added.) *Miranda* v. *Arizona*, supra, 384 U.S. 444. Thus, not all restrictions on a suspect's freedom of action rise to the level of custody for *Miranda* purposes; in other words, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland* v. *Shatzer*, 559 U.S. 98, 112, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010). Rather, the "ultimate inquiry" is whether a reasonable person in the defendant's position would believe that there was a "restraint on [her] freedom of movement of the degree associated with a formal arrest."[12] (Internal quotation marks omitted.)

*Thompson* v. *Keohane*, supra, 516 U.S. 112. Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address.

With respect to the issue of whether a person in the suspect's position reasonably would have believed that she was in police custody to the degree associated with a formal arrest, "no definitive list of factors governs [that] determination," which must be based on "the circumstances of each case . . . ." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 416, 40 A.3d 290 (2012). "Because, however, the [court in] *Miranda* . . . expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere containing [inherent] pressures [that, by their very nature, tend] to undermine the individual's [ability to make a free and voluntary decision as to whether to speak or remain silent] . . . circumstances relating to those kinds of concerns are highly relevant on the custody issue." (Internal quotation marks omitted.) Id., 416–17. In other words, "in order to determine how a suspect [reasonably] would have gauge[d] his freedom of movement, courts must examine all of the circumstances surrounding the interrogation." (Internal quotation marks omitted.) *Howes* v. *Fields*, supra, 132 S. Ct. 1189. Although this court has not been called on to decide whether the totality of the circumstances surrounding the execution of a search warrant at a suspect's home rendered the atmosphere police-dominated for purposes of *Miranda*, the Appellate Court has addressed that issue; see *State* v. *Read*, 132 Conn. App. 17, 20–23, 29 A.3d 919, cert. denied, 303 Conn. 916, 33 A.3d 740 (2011); and we previously have considered whether a suspect was in custody when he invited the police into his home and willingly agreed to speak to them. See *State* v. *Kirby*, 280 Conn. 361, 394–96, 908 A.2d 506 (2006); see also *State* v. *Johnson*, 241 Conn. 702, 719–20, 699 A.2d 57 (1997) (defendant voluntarily met with police in his father's residence). A review of these and related cases from this state, as well as federal and sister state cases involving the interrogation of a suspect during a police search of his residence, reveals the following nonexclusive list of factors to be considered in determining whether a suspect was in custody for purposes of *Miranda*: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was

isolated from friends, family and the public.

Finally, we set forth the standard of review. "The trial court's determination of the historical circumstances surrounding the defendant's interrogation [entails] findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of the circumstances, the trial court's finding is supported by substantial evidence. . . . The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, supra, 304 Conn. 417. In other words, we are bound to accept the factual findings of the trial court unless they are clearly erroneous, but we exercise plenary review over the ultimate issue of custody.

With these principles in mind, we turn to the merits of the defendant's claim that she was in custody when Hicks questioned her and, therefore, that her statements must be suppressed because she was not given *Miranda* warnings. As we have explained, that issue requires us to determine, first, whether a reasonable person in the defendant's position would have believed that she was free to leave the apartment while the police were executing the search warrant. If the answer to that question is yes, the inquiry is over because the defendant cannot establish custody for purposes of *Miranda*. If, however, the answer is no, we proceed to the second step of the inquiry, which asks whether that same reasonable person also would have believed that the police restraint on her freedom of action was akin to the restraint associated with a formal arrest.

With respect to the reasonableness of the defendant's belief that she was not free to leave, we agree that her subjective understanding was objectively reasonable.[13] Indeed, Hicks acknowledged that, in fact, the defendant was not free to leave, and, although she was not expressly so informed, the conduct of the police was fully consistent with her belief. Put differently, there is nothing in the conduct of the police that reasonably would have caused her to think otherwise. We need not address this issue further, however, in light of our determination that, for the reasons discussed hereinafter, a reasonable person in the defendant's position also would have believed that her freedom of action was restricted to the degree associated with a formal arrest.

Several key factors support the defendant's contention that the conduct of the police gave rise to an

atmosphere of police domination that caused the defendant to reasonably believe that she was in police custody during the search of her apartment. First, the police initiated contact with the defendant. "[W]hen the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist." *United States* v. *Griffin*, 922 F.2d 1343, 1351 (8th Cir. 1990). In the present case, the defendant did not invite the officers into her apartment; rather, they entered under the authority of a search warrant, an inherently coercive and intimidating police action. A wholly unexpected and highly intrusive law enforcement initiative of this sort is likely to be especially alarming when, as in the present case, the suspect is confronted by a large contingent of armed officers. Not surprisingly, Hicks acknowledged that the defendant did, indeed, appear concerned and startled by the unfolding events.

Second, officers brandished their weapons upon announcing themselves to the defendant and entering her apartment. Although the defendant does not question the propriety of this conduct, an occupant of the apartment reasonably would associate such a display of force with the compulsion routinely employed by police when effecting an arrest. See, e.g., *United States* v. *Hashime*, 734 F.3d 278, 283–84 (4th Cir. 2013) (defendant, who was awakened at gunpoint to find his house "occupied by a flood of armed officers," was deemed to be in custody during execution of search warrant); *United States* v. *Craighead*, 539 F.3d 1073, 1078, 1085 (9th Cir. 2008) (defendant was in custody during execution of search warrant by eight armed officers, some of whom unholstered their weapons in defendant's presence); *United States* v. *Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (defendant reasonably believed that he was in custody during execution of search warrant at his home when officers "awakened [him] at gunpoint and [kept him] guarded at all times"); *Moss* v. *State*, 823 P.2d 671, 671–72, 675 (Alaska App. 1991) (defendant was in custody when officers in raid gear with weapons drawn detained him in his residence incident to execution of search warrant); *State* v. *Chevre*, Minnesota Court of Appeals, Docket No. C5-99-1707 (Minn. App. August 8, 2000) (defendant was found to be in custody during execution of search warrant at his home after he "was confronted at gunpoint at night by a number of police officers as a part of a narcotics investigation"); *State* v. *Burdick*, 186 Or. App. 460, 462, 464, 63 P.3d 1190 (2003) (defendant was in custody after police forcibly entered his home with search warrant and ordered him and other occupants onto floor at gunpoint); *Wass* v. *Commonwealth*, 5 Va. App. 27, 34, 359 S.E.2d 836 (1987) (police had defendant in custody when execution of search warrant was marked by "armed display of manpower at his home"). In the present case, numerous

police officers approached the defendant's residence with a show of force that included drawn handguns, one or more rifles, and tactical vests, and, then, upon entering the apartment, those officers prohibited the defendant from leaving or otherwise moving about the apartment. In such circumstances, it was reasonable for the defendant to perceive such an imposing display of authority as a clear indication that the police intended to assume and maintain full control over her and her daughters. See, e.g., *Moss* v. *State*, supra, 675 ("[in] conclud[ing] that [the defendant] was in custody during the police questioning" at his home during execution of search warrant, court "emphasize[d] the fact that the police entered [his] residence at gunpoint and controlled his movements and [those of] the other residents at least at the beginning of the search").

Another factor that supports a finding of custody is the number of law enforcement personnel involved in the execution of the search warrant. A total of seven officers participated in the search of the defendant's residence, a police presence that is particularly significant in view of the fact that the defendant's apartment consisted of only four rooms. As the Ninth Circuit Court of Appeals has stated, "the presence of a large number of visibly armed law enforcement officers goes a long way [toward] making the suspect's home a police-dominated atmosphere." *United States* v. *Craighead*, supra, 539 F.3d 1085; see also *United States* v. *Revels*, 510 F.3d 1269, 1270, 1277 (10th Cir. 2007) (custodial interrogation of defendant occurred when seven officers from two different agencies entered his home to execute search warrant); *United States* v. *Mittel-Carey*, 493 F.3d 36, 39–40 (1st Cir. 2007) (defendant was in custody when eight officers executed search warrant in his home). In addition, there is an increased likelihood that a reasonable person in the defendant's position would have been intimidated by the considerable police presence because many, if not all, of the officers were in the living room with the defendant when Hicks questioned her.

The fact that the police exercised complete control over the defendant and her surroundings before, during and after Hicks' questioning of her is a fourth consideration that tends to establish custody. Immediately upon entering the apartment, the officers ordered the defendant and her three daughters to go to the living room, where they were required to remain, under guard. "[T]he likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest." *United States* v. *Griffin*, supra, 922 F.2d 1350–51. This exercise of total control over the defendant stands in stark contrast to the far more relaxed environment that is a hallmark of interrogations in a suspect's home that have been found to be noncustodial. For example, in *State* v. *Read*, supra, 132 Conn.

App. 17, the Appellate Court concluded that the defendant was not in custody during the execution of a search warrant when, after being told that he was "free to come and go as [he] pleased," he strolled, unaccompanied, around the property and, in fact, repeatedly left the searched premises to visit a nearby general store. (Internal quotation marks omitted.) Id., 21. In the present case, the defendant was confined to a couch in the living room, where she was kept under constant police observation and prohibited from moving about the apartment.

Finally, the police never provided the defendant with an explanation of the nature, purpose, or likely duration of her detention. At the very least, the circumstances of the entry and search by the police were sufficiently coercive and disquieting that the defendant reasonably would have been concerned about how long she would be detained and how she and her daughters otherwise would be treated by the police. Indeed, the fact that the police told the defendant nothing about whether or when she might be released could have led her to presume that her situation was not likely to change anytime soon.[14]

In this and several other important respects, the circumstances in which the defendant found herself are vastly different from those of other lawful seizures that have been deemed to be noncustodial for purposes of *Miranda*, the most commonplace of which is an ordinary traffic stop.[15] "Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced to speak [when] he would not otherwise do so freely . . . . First, [the] detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. . . . [Therefore, a] motorist's expectations, when he sees a [police cruiser's] light[s] flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. . . .

"Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. . . . [Specifically] the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of [the] officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Berkemer* v. *McCarty*, supra, 468 U.S. 437–38.

None of these mitigating considerations factored into the circumstances surrounding the detention of the defendant in the present case. The defendant had no way of knowing that she was being detained only temporarily, and, consequently, she had no reason to know or expect that her status as a detainee would end upon the conclusion of the search. Moreover, seven armed officers participated in the search, which took place in a setting free from public view, where the police exercised complete control over the defendant and her daughters. Under the circumstances, there simply is no reason why she would not have felt extremely vulnerable and "completely at the mercy of the police." Id., 438.

The officers easily could have told the defendant that she was not under arrest and that she was being detained merely for the duration of the search. Although not necessarily determinative of the custody issue, "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will."[16] (Citation omitted; internal quotation marks omitted.) *United States* v. *Griffin*, supra, 922 F.2d 1349; see also *Howes* v. *Fields*, supra, 132 S. Ct. 1193 (fact that police told suspect that he was free to leave and terminate interview was "[m]ost important" consideration for purposes of custody determination under *Miranda*); *State* v. *Greenfield*, 228 Conn. 62, 71 n.10, 634 A.2d 879 (1993) ("[o]ften, an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the [suspect] that he was free to leave at the outset of the interview"); cf. *United States* v. *Craighead*, supra, 539 F.3d 1087 ("[i]f a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody"). When, however, a detained suspect is not so informed but, instead, is kept in the dark about the purpose and duration of the detention, he is far more likely to view his seizure by the police as the functional equivalent of an arrest. See *Moss* v. *State*, supra, 823 P.2d 674 ("[e]specially when force is used or a display of weapons is made, a person who has been [detained] and placed in the effective custody—albeit temporary—of the police . . . will certainly understand that he has been placed in custody, but he may not understand the temporary nature of the seizure unless it is explained"). Even if a suspect is merely confused or unclear as to her custodial status, she may feel compelled to submit to police questioning for fear that her refusal to cooperate will reduce her chances for release or other favorable treatment. See, e.g., *Illinois* v. *Perkins*, 496 U.S. 292, 296–97, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) (suspect questioned by law enforcement officers under

coercive circumstances may "feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he [cooperate]").

It is true that a number of factors militate against a finding that the defendant in the present case was in custody. In particular, she was not handcuffed, the police did not threaten her or tell her that she was under arrest, and the questioning, which was brief, took place in her own home. For the following reasons, however, we are not persuaded that these factors outweigh the coercive features of the defendant's detention.

Perhaps the most significant consideration favoring the state's claim that the defendant was not in custody is the fact that the questioning took place in the familiar surroundings of the defendant's apartment. We recognize that an encounter with police is generally less likely to be custodial when it occurs in a suspect's home. See, e.g., *Miranda* v. *Arizona*, supra, 384 U.S. 449–50 ("[the suspect] is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home" [internal quotation marks omitted]); *United States* v. *Hashime*, supra, 734 F.3d 284 ("courts are generally less likely to characterize . . . interrogations in familiar settings like the home [as custodial]"). "*Miranda*, however, does not allow for a simple in-home [versus] out-of-home dichotomic analysis." *United States* v. *Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012). "More important than the familiarity of the surroundings [in his home] where [the defendant] was being [questioned] is the degree to which the police dominated the scene." *Sprosty* v. *Buchler*, 79 F.3d 635, 641 (7th Cir.), cert. denied, 519 U.S. 854, 117 S. Ct. 150, 136 L. Ed. 2d 95 (1996); see also *United States* v. *Griffin*, supra, 922 F.2d 1354–55 ("[q]uestioning [that] occurs in the suspect's own home may provide a margin of comfort, but . . . the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting"). Consequently, "when applying *Miranda* to the task of sorting a [noncustodial] in-home interrogation from a custodial one, [a court must consider] the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a police-dominated atmosphere." (Internal quotation marks omitted.) *United States* v. *Craighead*, supra, 539 F.3d 1083.

When a large contingent of armed police officers forcibly enter a suspect's residence under the official authority of a search warrant and detain the suspect during the search, that residence is no longer a bastion of privacy and security; rather, it has been transformed, albeit lawfully, into a hub of law enforcement activity directed against the suspect. Consequently, "it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intim-

idating environment created when agents of the law take control of a person's private residence." *United States* v. *Griffin*, supra, 1355 n.15. "[A] reasonable person interrogated inside his own home may [not understand that] he is truly free to terminate the interrogation if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." (Internal quotation marks omitted.) *United States* v. *Craighead*, supra, 1083. We therefore agree with the defendant that the facts and circumstances surrounding the police encounter in the present case "belie any conclusion that [the defendant's] home, [at the time] of the questioning at issue, was the traditional comfortable environment that . . . normally would [be] consider[ed] a neutral location for questioning." *United States* v. *Revels*, supra, 510 F.3d 1275–76.

The state also argues that, because the defendant was not handcuffed, she reasonably could not have believed that she was in custody to the degree associated with a formal arrest. As the state maintains, "[h]andcuffs are generally recognized as a hallmark of a formal arrest." *United States* v. *Newton*, 369 F.3d 659, 676 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004); see also *United States* v. *Maguire*, 359 F.3d 71, 79 (1st Cir. 2004) ("the use of handcuffs . . . [is] one of the most recognizable indicia of traditional arrest" [internal quotation marks omitted]). As we previously have explained, however, no one factor in a custody analysis is outcome determinative. See *Howes* v. *Fields*, supra, 132 S. Ct. 1189. Although the defendant was not handcuffed, the highly coercive atmosphere of the police entry and search, including the large and intimidating police presence, the severe limitation placed on the defendant's freedom of movement, and the failure of the police to explain to her the temporary nature of her detention lead us to conclude that the defendant reasonably would have believed that she was in custody even though the police did not use handcuffs.

In further support of its argument that the defendant was not in custody, the state also relies on the facts that the police did not tell her that she was under arrest, they did not threaten her, and the questioning was brief. Although the police never advised the defendant that she was under arrest, they also never told her that she was *not* under arrest, and their conduct—the same conduct that caused the defendant, reasonably and correctly, to believe that she was not free to leave—conveyed a clear message of complete, unfettered and temporally indefinite police control. The police also did not threaten the defendant, but the circumstances surrounding the search were themselves threatening and intimidating. Similarly, although the questioning

itself was neither prolonged nor intimidating, it was the coercive environment in which Hicks queried the defendant that reasonably caused her to believe that she was in custody. We therefore reject the state's contention that the several noncoercive elements of Hicks' questioning obviated the need for *Miranda* warnings.[17]

Although we conclude that the defendant's constitutional rights were violated when Hicks questioned the defendant without first issuing *Miranda* warnings, it bears emphasis that her detention during the execution of the search warrant was reasonable for purposes of the fourth amendment. As the United States Supreme Court held in *Michigan* v. *Summers*, supra, 452 U.S. 692, "for [f]ourth [a]mendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (Footnote omitted.) Id., 705; see also id., 702 (explaining that interests of officer safety, prevention of flight, and preservation of evidence are served by permitting police to detain occupant during execution of search warrant for his residence). It also is settled, however, that "whether an individual detained during the execution of a search warrant has been . . . seized for [f]ourth [a]mendment purposes and whether that individual is 'in custody' for *Miranda* purposes are two different issues"; *United States* v. *Kim*, 292 F.3d 969, 976 (9th Cir. 2002); because "[c]ustody for *Miranda* purposes requires a greater restraint on freedom than seizure under the [f]ourth [a]mendment."[18] *United States* v. *Cavazos*, supra, 668 F.3d 193; see also *United States* v. *Newton*, supra, 369 F.3d 673 ("[the] court . . . has specifically rejected [f]ourth [a]mendment reasonableness as the standard for resolving *Miranda* custody challenges"). Thus, "[a]lthough some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the [f]ourth [a]mendment, those same detentions may nonetheless create the custodial situation in which *Miranda* was designed to operate." *United States* v. *Revels*, supra, 510 F.3d 1274.

Furthermore, the fact that the fourth amendment permits the police to detain a suspect while executing a search warrant in her home does not alter the coercive effect of that detention, especially when the suspect is not informed that the detention is temporary. "[I]n many cases, when law enforcement agents conduct an in-home interrogation while conducting a lawful search of the home, physical control of the suspect will be necessary to preserve evidence and [to] protect the safety of the agents. The fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody." *United States* v. *Craighead*, supra, 539 F.3d 1086. We also agree that, "[i]f the . . . [officers'] actions were necessary for evidence preservation and officer safety, then [Hicks] could have

chosen to postpone the interrogation until a [noncustodial] moment . . . or to [administer *Miranda* warnings]. Either step would have protected both the defendant's constitutional rights and the officers' legitimate law enforcement needs." *United States* v. *Mittel-Carey*, supra, 493 F.3d 40.

We note, finally, that the state relies on language in *Michigan* v. *Summers*, supra, 452 U.S. 692, to support its contention that Hicks' questioning of the defendant was noncustodial. In *Summers*, the court, in explaining why the police did not violate the fourth amendment when they detained the respondent, George Summers, during the execution of a search warrant at his home, observed that Summers' detention in that case was "substantially less intrusive" than an arrest. (Internal quotation marks omitted.) Id., 702. In the state's view, the Appellate Court correctly concluded that this comment by the court in *Summers* establishes that a suspect is ordinarily not in custody when she is detained incident to the execution of a search warrant. See *State* v. *Mangual*, supra, 129 Conn. App. 648. The state also agrees with the Appellate Court that the trial court's determination on the issue of custody must be upheld because the trial court made no factual findings to support the conclusion that the defendant was subject to any greater limitations on her freedom of movement than those normally occurring when a search warrant is executed. See id.

We disagree with this analysis for several reasons. First, *Summers* is a fourth amendment case that had nothing to do with the question of when a suspect is in custody for purposes of *Miranda*. Second, because the court's decision in *Summers* says very little about the circumstances surrounding Summers' detention, we cannot discern whether and, if so, to what extent, the court considered those circumstances in concluding that the restraint on Summers' liberty was less than that of a formal arrest. Finally, as we have explained, courts invariably have looked to the facts of the particular case to determine whether, in light of all relevant circumstances, the suspect detained in his home was in custody for purposes of *Miranda*. Indeed, the United States Supreme Court consistently has emphasized that the fact specific issue of custody must be decided on the basis of the court's consideration of the totality of the circumstances surrounding the interrogation. See, e.g., *J. D. B.* v. *North Carolina*, U.S. , 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310 (2011); *Howes* v. *Fields*, supra, 132 S. Ct. 1189; *Thompson* v. *Keohane*, supra, 516 U.S. 112. Accordingly, we reject any suggestion that the defendant was not in custody for purposes of *Miranda* merely because she was lawfully detained inside her apartment during the execution of the search warrant.

II

Having determined that the trial court and the Appellate Court improperly concluded that the police were not required to advise the defendant of her *Miranda* rights prior to eliciting statements from her, we next must address the state's claim that the admission of those statements into evidence was harmless beyond a reasonable doubt. For the reasons that follow, we are not persuaded that the state can meet that demanding standard.

The state claims that its reliance on the defendant's statements had no bearing on the outcome of the trial because the other evidence of guilt was compelling. The defendant maintains that, although the heroin was discovered in the hairspray can found in her bedroom, her statements to Hicks constituted the only direct evidence that she knew that the heroin was in the hairspray can, and, further, the indirect or circumstantial evidence of her knowledge was not strong.

The following additional facts were adduced at trial and are relevant to this issue. In January and February, 2008, the defendant and her children resided with Jesus Ortiz, who shared a bedroom with the defendant, and Dionices Flores, known as "Bebo," who slept in a separate room in the apartment. The confidential informants who had participated in controlled purchases of heroin from inside the apartment reported buying the drugs from Hispanic males only, and one such informant specifically identified a Hispanic male named "Bebo" as the person from whom he had purchased heroin. Another informant, however, told police that he had witnessed a woman named "Ada" sell heroin, and that he believed that she was responsible for the drug sales in the apartment.[19]

During the search of the bedroom that the defendant and Ortiz had shared, investigating officers discovered the following items in addition to the hairspray can containing heroin: (1) separate pieces of mail addressed to the defendant, Ortiz and Flores; (2) a police scanner; (3) state social services cards for Jeffrey Moctezuma and Dionices Flores-Garcia; (4) more than $400 in cash; (5) a cell phone; and (6) two notebooks containing names, addresses and numbers. At some point during the search, Flores arrived, and the officers arrested him for possession of narcotics. The police also arrested the defendant and found her in possession of a cell phone and two $20 bills that had been used by one of the confidential informants to purchase heroin from inside the apartment.[20]

At trial, the defendant testified that the can of hairspray and the drugs found therein belonged to Flores, who sometimes would keep his belongings in her room. The defendant also testified that she did not know who owned the police scanner or the notebook, and that the notations in the notebook were not in her handwrit-

ing. She further stated that Ortiz owned one of the cell phones found by the police and that the other belonged to one of her daughters. In addition, the defendant claimed that the money seized from her bedroom came from several legitimate sources, in particular, wages that she had earned from her job at a restaurant, proceeds from workers' compensation and personal injury claims, and Flores' share of the rent and living expenses, which he paid to the defendant in cash every two weeks. One of the defendant's daughters also testified at trial and corroborated certain aspects of the defendant's testimony, including the defendant's contention that the hairspray can was owned by Flores. Finally, during closing argument to the jury, the state twice underscored the significance of the defendant's response to Hicks' questions.

"If statements taken in violation of *Miranda* are admitted into evidence during a trial, their admission must be reviewed in light of the harmless error doctrine. . . . [W]hether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459–60, 996 A.2d 251 (2010).

The defendant was convicted of possessing narcotics with the intent to sell. "[T]o prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . [When] . . . the [narcotics are] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . [When] the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Bruno*, 293 Conn. 127, 136, 975 A.2d 1253 (2009).

We agree with the defendant that the state cannot

demonstrate beyond a reasonable doubt that the improper admission of the defendant's statements was harmless because those statements were the only direct and definitive evidence of the defendant's knowledge that there was heroin in her bedroom. Evidence adduced at trial, if credited, tended to establish that Flores, who resided in the apartment with the defendant, exercised exclusive possession of and control over the drugs. For example, the defendant testified that the hairspray can belonged to Flores. The defendant and her daughter also testified that Flores sometimes left his belongings in the defendant's room. This testimony was corroborated by the fact that Flores' mail and his state social services card were found in the defendant's bedroom. From the search warrant affidavit, the jury was aware that a confidential informant told the police that he had bought heroin from a person in the apartment named "Bebo," Flores' nickname, who matched Flores' description. In addition, the defendant testified that Flores paid her in cash for his share of the rent and living expenses, thereby providing a plausible explanation for why she was found to possess the two $20 bills that were used by one of the confidential informants to purchase drugs from a Hispanic male, presumably Flores, inside the apartment. Although we acknowledge that, according to the search warrant affidavit that had been admitted into evidence, one of the confidential informants reported seeing a woman in the apartment named "Ada" selling heroin, this hearsay statement was not subject to cross-examination and can hardly be characterized as powerful evidence of the defendant's guilt, especially because none of the informants actually purchased heroin from the defendant. Finally, the relative importance of the defendant's statements to the state's case is reflected in the fact that the state twice referred to the statements during closing arguments.

Thus, although Hicks' testimony about the defendant's statements constituted overwhelming evidence of the defendant's knowledge that heroin was concealed in the hairspray can found in her bedroom, in the absence of those statements, it would not have been irrational or far-fetched for the jury to harbor a reasonable doubt with respect to that knowledge requirement. We therefore cannot say that the defendant's statements had no tendency to influence the judgment of the jury with respect to its resolution of the case. Accordingly, the improper admission into evidence of those statements was not harmless beyond a reasonable doubt.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to that court for a new trial.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] Under *Miranda*, if police question a suspect who is in custody, any

statements made by the suspect in response to the questioning will be suppressed unless, prior to the questioning, the suspect is advised that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda* v. *Arizona*, supra, 384 U.S. 444. The fundamental purpose of *Miranda* warnings, which, as the United States Supreme Court has reaffirmed, are constitutionally mandated; see *Dickerson* v. *United States*, 530 U.S. 428, 432, 444, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); is to ensure "that [an] individual [subjected to custodial police interrogation] is accorded his privilege under the [f]ifth [a]mendment to the [United States] [c]onstitution not to be compelled to incriminate himself." *Miranda* v. *Arizona*, supra, 439. The fifth amendment privilege against self-incrimination is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). The "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion" that is "irrebuttable for purposes of the prosecution's case in chief . . . ." *Oregon* v. *Elstad*, 470 U.S. 298, 307, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

[2] The defendant's daughters were nineteen, sixteen and thirteen years of age, respectively, when the police executed the search warrant.

[3] The record does not indicate how long it took the police to complete the search after discovering the heroin in the defendant's bedroom. We also note that all seven officers participated in the execution of the search warrant. Some of the officers were in police uniform; the other officers wore tactical vests identifying them as members of the department.

[4] The opinion of the Appellate Court also sets forth the following testimony that the defendant adduced in support of her motion to suppress. "[T]he defendant called [her sixteen year old daughter, who was present when the search was conducted]. [The daughter] testified that during the execution of the search warrant, the officers denied her requests to use the [bathroom] and to have the defendant sit in the living room area with the other occupants. In addition, she claimed that the officers removed the defendant's pit bull dog from the apartment and in doing so 'put [a] gun in the dog's face . . . .' Finally, [the daughter] testified that she did not feel free to leave the apartment while the officers were executing the search warrant.

"The defendant offered the following [additional] testimony in support of her motion. When the police entered the apartment, they were carrying rifles and did not inform her that they had a search and seizure warrant. She asked to sit next to her daughters and to use the bathroom, but the officers denied both requests. She admitted that the officers did not place her in handcuffs but testified that she did not feel free to leave the apartment or to ask the officers to leave." *State* v. *Mangual*, supra, 129 Conn. App. 643. The trial court made no reference to this testimony, which the state disputed in certain material respects. We therefore do not consider it for purposes of this appeal.

[5] The defendant sought to suppress "any response" that she allegedly gave to Hicks as a result of the questioning. This includes both her verbal acknowledgment that there were drugs in the apartment as well as her conduct in leading the police to the heroin secreted in the hairspray can in the bedroom. For the reasons set forth hereinafter, the defendant is entitled to suppression of that expressive conduct, both verbal and nonverbal, in response to Hicks' questioning. See, e.g., *Pennsylvania* v. *Muniz*, 496 U.S. 582, 589, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) (fifth amendment protects individuals from compulsion to provide state with testimonial communications that "explicitly or implicitly . . . relate a factual assertion or disclose information" [internal quotation marks omitted]); *People* v. *Hoffman*, 84 Ill. 2d 480, 490, 419 N.E.2d 1145 (1981) ("the act of leading [an] officer to the place where the pistol was found was conduct of a testimonial nature and, in the absence of *Miranda* warnings, testimony concerning that fact should have been suppressed"); *State* v. *Wethered*, 110 Wn. 2d 466, 471, 755 P.2d 797 (1988) ("[when] a police officer's questioning or requests induce a suspect to hand over or reveal the location of incriminating evidence, such [a] nonverbal act may be testimonial in nature; the act should be suppressed if done while in custody in the absence of *Miranda* warnings"). All references in this opinion to the defendant's statements include both her verbal and nonverbal conduct.

We also note that the defendant asserts, in passing, that the police likely would not have discovered the heroin hidden in the hairspray can if the defendant had not alerted police to its existence. The defendant, however,

has raised no claim that the heroin itself should be suppressed as a fruit of the *Miranda* violation. Indeed, a statement that is obtained in violation of *Miranda* does not require suppression of the physical fruits of the suspect's unwarned but otherwise voluntary statements. See, e.g., *United States* v. *Patane*, 542 U.S. 630, 636–37, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004); *United States* v. *Parker*, 549 F.3d 5, 10 (1st Cir. 2008), cert. denied, 556 U.S. 1160, 129 S. Ct. 1688, 173 L. Ed. 2d 1050 (2009).

[6] The defendant also claimed that the trial court violated her constitutional right to present a defense by excluding evidence that another resident of the apartment, Dionices Flores, known as "Bebo," had pleaded guilty to possession of the heroin discovered in her bedroom. *State* v. *Mangual*, supra, 129 Conn. App. 649. The Appellate Court determined that the record was inadequate for review of the claim and therefore declined to consider it. Id. That claim is not at issue in the present appeal.

[7] The defendant does not assert that her rights under article first, § 8, of the Connecticut constitution were violated. Rather, her claim is limited to the protections afforded under the fifth and fourteenth amendments to the United States constitution. Accordingly, our analysis is also limited to those federal constitutional provisions.

[8] Thus, even "patently voluntary statements taken in violation of *Miranda* must be excluded from the prosecution's case . . . ." (Emphasis omitted.) *Oregon* v. *Elstad*, 470 U.S. 298, 307, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

[9] The defendant bears the burden of establishing custodial interrogation. E.g., *State* v. *Jackson*, 304 Conn. 383, 417, 40 A.3d 290 (2012).

[10] We note that, at trial, the defendant testified that she had not made any statements to Hicks. In view of the fact that the state takes a contrary position, the defendant nevertheless is entitled to seek to have Hicks' testimony suppressed because the jury would be free to consider that testimony unless, of course, it is excluded under *Miranda*. To be sure, *Miranda* is not a license to commit perjury, and statements obtained in violation of *Miranda*, if not the product of improper police coercion, are admissible for impeachment purposes. See, e.g., *Harris* v. *New York*, 401 U.S. 222, 225–26, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971); *State* v. *Burge*, 195 Conn. 232, 250–51, 487 A.2d 532 (1985). The issue in the present case, however, is whether the trial court properly permitted the state to use the defendant's statements in its case-in-chief.

[11] Thus, in *Berkemer*, the court concluded that a motorist who is subject to an ordinary traffic stop generally will not be deemed to be in custody for purposes of *Miranda* even though "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Berkemer* v. *McCarty*, supra, 468 U.S. 436. Although the court acknowledged that even a routine traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers"; id.; it explained that, because the brief detention typically associated with such stops, like the brief detention for investigative purposes permitted under *Terry* v. *Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (if police officer has reasonable and articulable suspicion that criminal activity may be afoot, officer may briefly stop suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions), is "comparatively nonthreatening" and "noncoercive," *Miranda* warnings are not required for "detentions of [that] sort" unless the police engage in conduct further limiting the freedom of action of the person detained to a degree akin to that of a formal arrest. *Berkemer* v. *McCarty*, supra, 440.

[12] Thus, "a free-to-leave inquiry reveals only whether the person questioned was seized. . . . Because seizure is a necessary prerequisite to *Miranda* . . . it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought [that he was] free to leave, additional analysis is required because, as *Berkemer* v. *McCarty*, [supra, 468 U.S. 439–40] instructs, not every seizure constitutes custody for purposes of *Miranda*. . . . In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. . . . Only if the answer to this second question is yes was the person in custody for practical purposes . . . and entitled to the full panoply of protections prescribed by *Miranda*. *Berkemer* v. *McCarty*, [supra, 440]." (Citations omitted; internal quotation marks omitted.) *United States* v. *Newton*, 369 F.3d 659, 672 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004).

We note that, although this court frequently has defined custody for

purposes of *Miranda* as a restraint on the suspect's freedom of movement to a degree associated with a formal arrest, we have not always clearly distinguished that ultimate inquiry from the threshold determination of whether a reasonable person in the suspect's position would feel free to terminate the questioning and leave. Specifically, we sometimes have appeared to conflate those two distinct inquiries by suggesting that a suspect who demonstrates that she reasonably believed that she was not free to leave necessarily satisfies the second, ultimate step in the analytic process, namely, that the restraint on her freedom of movement was tantamount to that of a formal arrest. See, e.g., *In re Kevin K.*, 299 Conn. 107, 127, 128, 7 A.3d 898 (2010) (explaining that, "in determining whether *Miranda* rights are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest," but characterizing "[t]he ultimate determination of whether a defendant was subjected to a custodial interrogation" as depending on whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and [to] leave" [internal quotation marks omitted]); *State* v. *Kirby*, 280 Conn. 361, 393, 394, 908 A.2d 506 (2006) (same). Indeed, on occasion, we have recited the test for custody solely in terms of the suspect's reasonable belief that he was not free to leave. See, e.g., *State* v. *Mullins*, 288 Conn. 345, 363, 952 A.2d 784 (2008) (stating that, in determining whether suspect is in custody for purposes of *Miranda*, "[t]he trial court first makes a factual determination of the circumstances surrounding the alleged interrogation and then applies those facts to an objective test as to whether a reasonable person would have felt that he or she was not at liberty to leave"); *State* v. *Canales*, 281 Conn. 572, 584–85, 916 A.2d 767 (2007) (same); see also *State* v. *Burroughs*, 288 Conn. 836, 844 n.5, 955 A.2d 43 (2008) ("the test for determining custody for *Miranda* purposes is the same in all material respects as the test that this court uses to determine whether an individual [has been] seized, that is, whether a reasonable person in the defendant's position would have believed that he was not free to leave"). To the extent that these cases have failed to recognize the distinction between the two separate steps that comprise the test for determining custody for purposes of *Miranda*, we take this opportunity to underscore the constitutional significance of that distinction.

[13] We emphasize that the test for whether an interrogation was custodial is an objective one. "[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant. . . . The test, in other words, involves no consideration of the actual mindset of the particular suspect subjected to police questioning." (Citation omitted; internal quotation marks omitted.) *J. D. B.* v. *North Carolina*,      U.S.     , 131 S. Ct. 2394, 2402, 180 L. Ed. 2d 310 (2011).

[14] Of course, when the police entered the apartment and confronted the defendant, they could not have told her that she necessarily would be free to leave upon completion of the search because, before conducting the search, the police did not know whether she ultimately would be arrested. They could have told the defendant, however, that, at that time, she was not under arrest and that she was being detained solely for the purpose of the safe and efficient execution of the search warrant.

[15] Another such seizure is the *Terry* stop. *Terry* v. *Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); see footnote 11 of this opinion.

[16] Although this factor invariably has been treated as an important one for purposes of determining custody, many courts have concluded that, under the circumstances of the particular case, advising the suspect that he was not under arrest and was free to leave was insufficient to support a conclusion that he was not in custody for purposes of *Miranda*, even when the questioning was conducted in the suspect's home. See, e.g., *United States* v. *Hashime*, supra, 734 F.3d 284 ("[T]o the extent that law enforcement told [the defendant] that he did not have to answer questions and was free to leave, that by itself does not make the interrogation [noncustodial]. Although a statement that the individual being interrogated is free to leave may be highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was in custody, such a statement is not . . . sufficient in and of itself to show a lack of custody." [Internal quotation marks omitted.]); *United States* v. *Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012) ("The [g]overnment places significant emphasis on the fact that the agents informed [the defendant] that the interview was [noncustodial]. Such statements, while clearly relevant to a *Miranda* analysis, are not a talismanic factor. . . . [Rather] [t]hey must be analyzed for their effect on a reasonable person's perception [at the time they are made], and weighed against opposing facts." [Citations omitted; internal quotation marks omitted.]); *United States* v. *Craighead*, supra, 539 F.3d 1088 ("The

mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation [noncustodial] *per se*. We must consider the delivery of these statements in the context of the scene as a whole." [Emphasis in original.]).

[17] The state asserts that the defendant's detention was akin to a *Terry* stop; *Terry* v. *Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); which, as we previously noted; see footnote 11 of this opinion; has been deemed noncustodial for purposes of *Miranda*. Under the circumstances of the present case, we disagree with the state's contention. Ordinarily, a *Terry* stop is made by one or perhaps two officers, frequently in public view. When an officer approaches and questions a suspect in accordance with *Terry*, most often, it will be apparent to the suspect that the officer's inquiries are preliminary to more formal action, if any. Thus, although a *Terry* stop entails a curtailment of the suspect's freedom of movement that is not slight or trivial, such a stop, like a traffic stop, has been characterized as "comparatively nonthreatening" and "noncoercive . . . ." *Berkemer* v. *McCarty*, supra, 468 U.S. 440. In marked contrast, the circumstances surrounding the search in the present case—including the fact that it was conducted out of public view by a large contingent of armed officers, none of whom informed the defendant of the duration of her detention—leads us to conclude that that search and Hicks' questioning were conducted in a coercive and intimidating environment.

[18] See footnote 17 of this opinion.

[19] The jury learned about the controlled purchases of heroin by the confidential informants because, at trial, the defense introduced the search warrant affidavit into evidence. The informants did not testify at the suppression hearing or at trial.

[20] The state introduced conflicting testimony about where the police discovered the buy money and the two cell phones. Neither testimonial inconsistency, however, bears on our determination of whether the improper admission of the defendant's statements was harmful.